OPINION *Page 2 
{¶ 1} The defendant-appellant, Jack W. Scott, appeals the judgment of the Hardin County Common Pleas Court convicting him on nine counts of child endangering following a jury trial. On appeal, Jack contends that the trial court erred by overruling his Crim.R. 29 motions; that the convictions were against the manifest weight of the evidence; that he had the ineffective assistance of trial counsel; and that the trial court erred by sentencing him to maximum, consecutive prison terms. For the reasons expressed herein, the judgment of the trial court is affirmed in part and reversed in part.
 {¶ 2} On September 19, 2005, the Hardin County Grand Jury indicted Jack on six counts[1] of endangering children, violations of R.C.2919.22(A), (E)(2)(b), felonies of the fourth degree; seven counts[2]
of endangering children, violations of R.C. 2919.22(A), (E)(2)(c), felonies of the third degree; two counts[3] of endangering children, violations of R.C. 2919.22(B)(1), (E)(2)(d), felonies of the second degree; one count[4] of endangering children, a violation of R.C.2919.22(B)(2), (D)(3), a felony of the second degree; and one count[5]
of intimidating an attorney, victim, or witness in a criminal case, a violation of R.C. *Page 3 2921.04(B), a felony of the third degree. Jack pled not guilty to each of the offenses at arraignment.
 {¶ 3} The charges were based on Jack's alleged abuse of Tra Manns, Stephanie Manns' eighteen-month-old toddler. On or about September 22, 2004, Jack moved in with Stephanie, his then girlfriend, and Tra. Between that date and December 5, 2004, Stephanie was employed in Ada, Ohio, and while she was at work, Jack, who was unemployed, was Tra's primary caregiver. During that time, Tra suffered multiple injuries, including a bump on his head, injuries to his leg, and injuries to his arm. Between December 3, 2004 and December 5, 2004, Stephanie noticed that Tra was favoring his right arm, and that he did not use his arm or want pressure applied to it. Tra also became ill, refusing his favorite foods, vomiting, and refusing to sleep. On December 5, 2004, Stephanie took Tra to St. Rita's Medical Center in Lima, Ohio. After some procedures were conducted at the hospital, Tra was transferred to Children's Hospital in Columbus, Ohio, where he was ultimately found to have suffered a fractured skull, fractured collar bones, a fractured humerus, a fractured shoulder blade, a fractured metatarsal, several fractured ribs, and a lacerated liver. Additionally, Tra's face, arms, legs, torso, back, and genital area were bruised, and his torso was covered in a rash. Scratches on Tra's legs were caused by the puppy Jack and Stephanie had, and Stephanie explained that injuries to Tra's bottom lip resulted from a tumble into the coffee *Page 4 
table. However, Tra's other injuries were unexplained, and the doctors believed them to be the result of child abuse. On December 7, 2004, Tra died in the hospital, apparently from a staph infection.
 {¶ 4} After the discovery process was completed, the court bifurcated the indictment for trial. Beginning on April 16, 2007, the court conducted a three-day jury trial on counts one through ten of the indictment. The state presented testimony from eight witnesses, the defense presented testimony from four witnesses, and each party had exhibits admitted into evidence. The parties also filed stipulations, which were journalized by the court on April 17, 2007. The jury found Jack guilty on counts one through seven and counts nine and ten; the trial court having dismissed count eight on Jack's first Crim.R. 29 motion.
 {¶ 5} On May 2, 2007, the state dismissed counts eleven through seventeen of the indictment, and the court imposed sentence on May 3, 2007. After hearing evidence from the state and arguments by both parties, the trial court held that counts one, three, five, and nine were allied offenses of similar import and merged count one with count two, count three with count four, count five with count six, and count nine with count ten. The court proceeded to sentence Jack to five-year prison terms on counts two, four, six, and ten, and an eighteen-month prison term on count seven. The court ordered each prison term to be served consecutively to all other prison terms for an aggregate sentence of twenty-one *Page 5 
years and six months. The court also ordered Jack to pay restitution in the amount of $38,156.03 and the costs of prosecution. Jack appeals the judgment of the trial court and asserts four assignments of error for our review.
 First Assignment of Error Appellant's conviction for nine (9) counts of Child Endangering was not supported by sufficient, credible evidence and the lower court erred in denying Appellant's Rule 29 Motion for Acquittal.
 Second Assignment of Error Appellant's conviction for nine (9) counts of Child Endangering was against the manifest weight of the evidence.
 Third Assignment of Error Appellant was denied the right to effective assistance of counsel and a right to a fair trial.
 Fourth Assignment of Error The lower court erred in imposing consecutive maximum sentences.
 {¶ 6} In the first assignment of error, Jack contends that the trial court should have granted his Crim.R. 29 motion for acquittal, which was made at the close of the state's evidence and renewed after the defense rested. Jack claims the state failed to prove that he acted recklessly; that he created a substantial risk to Tra's health or safety; that he violated a duty of care; or that he caused serious physical harm to Tra. In response, the state contends that the jury could have found each element of each charge beyond a reasonable doubt because Jack's *Page 6 
explanation of Tra's injuries did not account for the severity of the injuries or address expert testimony that Tra's injuries were the result of abuse.
 {¶ 7} Jack was tried on ten counts of child endangering. The relevant statutory sections provide:
 (A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.
 * * *
 (E)(2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following:
 * * *
 (b) If the offender previously has been convicted of an offense under this section or of any offense involving neglect, abandonment, contributing to the delinquency of, or physical abuse of a child, except as otherwise provided in division (E)(2)(c) or (d) of this section, a felony of the fourth degree;
 (c) If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, a felony of the third degree * * * .
R.C. 2919.22(A), (E)(2)(b),(c). For each set of facts leading to a criminal charge, the state indicted Jack under both R.C.2929.19(E)(2)(b) and (E)(2)(c). Counts one and two were based on injuries Tra sustained when Jack allegedly held him by the wrists and hands and swung him in circles approximately two feet above the ground. Counts three and four were based on injuries allegedly sustained during *Page 7 
the "porch incident." At that time, Jack momentarily left Tra on the porch of Stephanie's residence, and Tra fell off the porch, suffering injuries. Counts five and six were based on Tra's unexplained injuries such as the broken ribs, lacerated liver, and multiple bruises, which the state's medical expert opined were caused by abuse. Counts seven and eight resulted from the "water incident," where Jack momentarily held Tra's head under water or in a stream of water in an attempt to clean paint off of the child's face. During trial, the court dismissed count eight after the state conceded that it had not presented any evidence of "serious physical harm" resulting from the "water incident." Finally, counts nine and ten were prompted by Tra's injury consisting of a lump, which witnesses testified was the size of either a golf ball or a baseball, on his head. The evidence revealed that this injury was caused when Tra stood up on a gliding footstool, lost his balance, and fell.
 {¶ 8} A motion for acquittal, made pursuant to Crim.R. 29(A) is reviewed under the same standard used to determine if a verdict was supported by sufficient evidence. State v. Moyar, 3d Dist. No. 2-06-10,2006-Ohio-5974, at ¶ 12, quoting State v. Tenace, 109 Ohio St.3d 255,2006-Ohio-2417, 847 N.E.2d 386, at ¶ 37, citing State v. Carter,72 Ohio St.3d 545, 553, 1995-Ohio-104, 651 N.E.2d 965; State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. Sufficiency of the evidence is a test of adequacy, used to "`determine whether the *Page 8 
case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" Thompkins, at 386, quoting Black's Law Dictionary (6 Ed. 1990) 1433; citing Crim.R. 29(A);State v. Robinson (1955), 162 Ohio St. 486, 124 N.E.2d 148. A conviction based on insufficient evidence constitutes a denial of due process, and the defendant may not be recharged for the offense. Id. at 386-387, citing Tibbs v. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211,72 L.Ed.2d 652, citing Jackson v. Virginia (1979), 443 U.S. 307,99 S.Ct. 2781, 61 L.Ed.2d 560. In reviewing a claim under the sufficiency of the evidence standard, an appellate court must determine "`whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" State v. Bridge, 3d Dist. No. 1-06-30, 2007-Ohio-1764, quoting State v. Jenks (1991),61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds as stated in State v.Smith, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668.
 {¶ 9} We begin by examining the elements of R.C. 2919.22(E)(2)(b), which elevate the charge of child endangering to a fourth-degree felony if the defendant has been previously convicted of certain offenses set forth above. The parties made several stipulations prior to trial, one of which agreed to the identification, authenticity, and admission of State's Exhibits 7, 8, and 9. State's *Page 9 
Exhibit 7 was a certified copy of Jack's conviction for endangering children in Hardin County Common Pleas Court case number 962046-CRI. State's Exhibit 8 was a certified copy of Jack's conviction for assault of a minor child in Hardin County Common Plea Court case number AC20340083, and State's Exhibit 9 was a certified copy of Jack's conviction for contributing to the delinquency of a minor in Hardin County Common Pleas Court case number 20042147-CRI. Jack's first conviction was dated August 16, 1996, the second conviction was dated October 7, 2003, and the third conviction was dated September 2, 2005. Therefore, as to counts one, three, five, seven, and nine, there was sufficient evidence to prove the elements for enhancement required under R.C. 2919.22(E)(2)(b).
 {¶ 10} We next examine the elements of R.C. 2919.22(E)(2)(c), which the state was required to prove to sustain the enhancements on counts two, four, six, and ten. Under that sub-section, the state was required to prove that Tra suffered serious physical harm, which is defined as:
 Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 (b) Any physical harm that carries a substantial risk of death;
 (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 (d) Any physical harm that involves some permanent *Page 10 disfigurement or that involves some temporary, serious disfigurement;
 (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.
R.C. 2901.01(A)(5)(a)-(e). In count two, Jack was charged for the incident where he swung Tra by his arms approximately two feet off of the ground, which resulted in the injuries to Tra's right collar bone, right humerus, and right shoulder. Stephanie testified that Tra "favored" his right arm beginning on Friday, December 3, 2004, and by the next day, his arm looked bruised and his collar bone was getting red. (Trial Tr., Aug. 20, 2007, at 167-171; 207). Millie Brown, Stephanie's cousin and neighbor, indicated that she saw Tra on Saturday, December 4, 2004, and at that time, Tra was "favoring" his arm. (Id. at 328). Millie testified that Tra kept his arm close to his body and did not want people to touch it. (Id. at 328-329). On this record, there was sufficient evidence to prove that Tra had suffered serious physical harm to his collar bone, shoulder, and arm because his injuries certainly caused some substantial, temporary incapacity (assuming the bones would have been set and healed had he been treated earlier) and because the injuries resulted in substantial suffering or prolonged, intractable pain since he suffered from the pain for more than two days before seeing a physician. *Page 11 
 {¶ 11} Count four was based on the injuries Tra suffered from the "porch incident" which occurred on or about November 25, 2004. Stephanie testified that on or about that date, she observed Tra limping, and Jack told her Tra had fallen off of the 13-inch high porch because the railing was loose. (Id. at 198). Stephanie indicated that Tra continued to limp on the leg and did not want to put pressure on it. (Id. at 200). As a result of the leg injury, Jack scheduled an appointment with Tra's pediatrician for Thursday, December 2, 2004; however, he missed the appointment after he allegedly "overslept." (Id. at 201-202).
 {¶ 12} Tracy Snyder, the pediatrian's medical receptionist, testified that a male had called the office and scheduled an appointment for November 29, 2004 because Tra had a hangnail on his toe. (Id. at 275-276). However, prior to that date, a male called the office, indicated that the hangnail was better, and rescheduled the appointment for December 2, 2004 because Tra had leg pain. (Id. at 276). Snyder told the jury that Tra did not "show up" for the December 2 appointment. (Id.). Detective Robert Wagner testified that Jack voluntarily met with him to discuss Tra's injuries; that Jack waived his Miranda rights prior to the interview; and that the interview was recorded. (Id. at 291). During the interview, Jack told Wagner that following his fall from the porch, Tra had been limping for a few weeks. (Id. at 303). Jack also told Wagner that he had overslept and missed Tra's doctor appointment. (Id. at 303). *Page 12 
 {¶ 13} Pauline Seitz, Millie Brown's mother, testified that she saw Tra on Thanksgiving Day 2004 and that he was dragging his foot "a little." (Id. at 365). Chris Glick, a neighbor and acquaintance of Jack's and Stephanie's stated that he did some painting with Jack on December 1, 2004, and on that day, he observed Tra dragging his leg. (Id. at 353). John Manns, Stephanie's brother, testified that he observed Tra limping, and Jack told him Tra had fallen off the porch because of a loose railing. (Id. at 371). Dr. Phillip V. Scribano, from Children's Hospital, testified that Tra's left metatarsal was broken, and that he had another injury closer to his ankle. (Id. at 406). Based on this testimony, there was sufficient evidence for the jury to find that Tra had suffered serious physical harm because he had suffered some temporary, substantial incapacity (again, provided that the injuries would have healed with proper medical treatment) and because Tra's injury resulted in substantial suffering.
 {¶ 14} Count six was based on Tra's other "unexplained" injuries, such as the broken ribs and liver laceration. Scribano, the director of an organization servicing child abuse victims at Children's Hospital, testified that Tra's belly was "impressive" because it was distended and very tender. (Id. at 391). Scribano stated that upon making these observations, he knew there was significant trauma to Tra's liver. (Id.). Scribano stated that CAT scans taken at St. Rita's showed a laceration, or cut, to Tra's liver, which he graded as a three out of four, with a four *Page 13 
being the most severe injury. (Id. at 396). Scribano testified that an injury of that type and severity is usually found only in victims of car crashes and victims of abuse due to severe pressure to the abdomen, which forces the liver to compress against the spine. (Id. at 397-398). Scribano indicated that Tra's medical history did not show any evidence of an automobile accident, and he testified that chemical testing showed abnormal results, indicating injury to the liver. (Id. at 399; 400-402). The injury to the liver resulted in internal bleeding, which required Tra to have a blood transfusion at Children's Hospital. (Id. at 402). Scribano opined based on a reasonable degree of medical certainty that the injury to Tra's liver was approximately one to two days old when Tra was admitted to St. Rita's on December 5, 2004, and that Tra's injuries were not accidental, though he could not state exactly how the injuries were sustained. (Id. at 433; 437). On this record, there was sufficient evidence for a jury to find that Tra suffered severe physical harm based on the injuries in count six, as at least the liver laceration required hospitalization.
 {¶ 15} The injury which resulted in count ten was a bump on the head Tra sustained when he allegedly fell off a gliding footstool. Stephanie testified that she felt a lump on Tra's head in October 2004 (after Jack had moved in) and that she took Tra to the emergency room at Lima Memorial Hospital. (Id. at 238-239). On cross-examination, Stephanie indicated she did not know Tra had the lump on *Page 14 
his head until she felt it, and Jack told her he did not know how Tra got the lump. (Id. at 239). At the emergency room, the physician determined that x-rays were unnecessary and told Stephanie that the lump "would go away in a few days," which it apparently did. (Id. at 240). Stephanie also testified that Tra did not engage in any behavior that would have caused her to think he was in pain from the lump.
 {¶ 16} Millie Brown testified that she went to the emergency room with Stephanie and Tra. (Id. at 323). Millie stated that the lump was approximately the size of a golf ball. John Manns stated that on one occasion, Jack and Tra stopped at his house for a visit. (Id. at 369). John testified that Tra was sitting in his lap, and he was running his hand through Tra's hair when he noticed a lump on Tra's head. (Id. at 369-370). John estimated that the lump was the size of a baseball, but "maybe a little smaller." (Id. at 370). John asked Jack what had happened, and Jack told him Tra had fallen off a gliding footstool and hit his head. (Id.). On cross-examination, John stated that he had seen Tra climbing on the footstool on prior occasions, and it would have been easy for him to fall off. (Id. at 374).
 {¶ 17} On this record, there was insufficient evidence to prove that Tra suffered serious physical harm. There was no evidence that Tra suffered any temporary, serious disfigurement. Although the testimony was clear to establish that Tra had a lump the size of a golf ball or a baseball on his head, the evidence *Page 15 
was also clear that nobody noticed the lump until they felt it. Though not on the record, we imagine Tra suffered some pain at the time of the injury; however, there was no evidence that he took notice of the lump or responded when other people touched it. Therefore, we cannot conclude that the evidence was sufficient to show substantial pain. Finally, the fact that the emergency room doctor did not order x-rays and simply sent Tra home with Stephanie while explaining that the lump would go away within a few days shows that the lump was not a serious or substantial injury. As a result, even if the state met its burden in proving the elements of R.C. 2919.22(A), it did not meet its burden in proving R.C.2919.22(E)(2)(c), and Jack's conviction on count ten must be reversed.
 {¶ 18} Turning to the crux of Jack's argument, we must examine whether the state produced sufficient evidence to establish the essential elements of R.C. 2919.22(A) as to each of the remaining charges (counts one through seven and count nine). "To prove endangering children * * * under R.C. 2919.22(A), the State must prove that the defendant was the parent, guardian, custodian, person having custody or control, or person in place of a parent of a child, [and that the defendant] created a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." State v. Troglin, 3d Dist. No. 14-04-41, 2005-Ohio-6562, at ¶ 35, citing R.C. 2919.22(A). A "substantial risk" is "a strong possibility, as contrasted with a remote * * * possibility, that a certain result *Page 16 
may occur or that certain circumstances may exist." R.C. 2901.01(H). The other element the state must prove is recklessness. State v. McGee,79 Ohio St.3d 193, 195, 1997-Ohio-156, 680 N.E.2d 975 ("R.C. 2919.22(A) neither specifies a degree of required culpability nor plainly indicates that the General Assembly intended to impose strict liability. Accordingly, we hold that the existence of the culpable mental state of recklessness is an essential element of the crime of endangering children under R.C. 2919.22(A).").
 A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
R.C. 2901.22(C).
 {¶ 19} As an initial matter, the state produced sufficient evidence to prove that Jack had control over Tra. Stephanie testified that she worked from approximately 6:00 a.m. through 2:25 p.m. or that she would work from 7:00 a.m. through 3:25 p.m. Monday through Friday. Stephanie also worked on several Saturdays each month from early in the morning until approximately 12:00 p.m. During the times Stephanie was at work, Jack was Tra's caretaker. (Trial Tr., at 158). Stephanie testified that Jack was the only person who watched Tra during the time they lived together. (Id. at 158). The record reveals that Jack frequently *Page 17 
took Tra to his friends' and families' houses through the day; however, Jack told Detective Wagner that none of his friends could have caused Tra's injuries because he was always present. (Id. at 293-294). Stephanie testified that each time Tra was noticeably injured, his injuries occurred between the time she went to work and the time she returned home. On this record, there was sufficient evidence to show that Jack was a person with control over the child.
 {¶ 20} Counts one and two both resulted from the injuries Tra sustained while Jack allegedly swung him in circles. The record reveals that Jack would hold Tra by the hands and wrists, and spin himself in circles, thereby causing Tra to be lifted off the ground, to a height of approximately two feet, and rotated in circles around Jack. Stephanie testified that Tra began to favor his arm on December 3, 2004. (Id. at 167-168). Jack explained to Stephanie that he had been swinging Tra as described above. Jack told Stephanie he swung Tra a total of three times, and that he quit when Tra "whimpered." (Id.). On cross-examination, Stephanie testified that Jack was swinging Tra because Tra thought the activity was fun, and that Jack had no intention of injuring the child. Jack relayed a similar story to Detective Wagner. Jack told the detective that he would swing Tra around five or six times and then put him down. (Id. at 295). Jack completed two rounds of five or six circles, but on the third set, Tra "whimpered" so he quit. (Id.). *Page 18 
 {¶ 21} The state's expert witness, Scribano, offered a different theory on Jack's swinging of Tra. Scribano testified that he had seen or heard of adults swinging a child in a manner similar to that which Jack described. However, he stated that merely swinging the child in such a way was not consistent with the injury to Tra's right collar bone. (Id. at 412). Instead, the doctor opined that the injuries Tra sustained were caused by a very forceful jerk or swinging. (Id. at 413). Pressed further, Scribano stated that such injuries could have resulted from swinging the child, but that the swinging had to have been very forceful. (Id. at 414). Scribano's ultimate conclusion was that Tra's injuries resulted from abuse. (Id. at 415).
 {¶ 22} The facts as to counts one and two were clear. Tra sustained fractures to his collar bone, humerus, and shoulder blade. The injury occurred during a time when only Jack had access to the child. Although Jack had an explanation, which appears to be plausible, for why Tra had been favoring his right arm, the jury could have easily disbelieved such theory after hearing Scribano's expert testimony and viewing the physical evidence showing Tra's injuries. If the jury believed Scribano, which it apparently did, it could have easily found that Jack had recklessly created a substantial risk of harm to Tra's health or safety by swinging him in such a forceful manner. On these facts, there was sufficient evidence in the record to support the convictions on counts one and two. *Page 19 
See generally State v. Flory, 3d Dist. No. 15-04-18, 2005-Ohio-2251, at ¶ 7 ("The State also presented evidence that Flory's explanations of the accidents did not explain the extent of the injuries suffered by Kaleb during his short life and that the injuries were consistent with abuse. * * * Viewing this evidence in a light most favorable to the State, a reasonable juror could conclude that Flory recklessly had created a substantial risk to the health and safety of Kaleb by violating his duty of care to the child.").
 {¶ 23} The third and fourth counts were based on the leg injuries Tra suffered during the "porch incident." Stephanie testified that on or about November 25, 2004, she noticed Tra limping. (Trial Tr., at 198). When she inquired, Jack told her Tra had been playing on the porch railing, which came loose and caused him to fall. (Id. at 198-199). Stephanie testified that Jack cancelled Tra's doctor's appointment, which had been scheduled for the end of November; that he scheduled an appointment for December 2, 2004; and that he missed the December 2 appointment, claiming that he had overslept. (Id. at 201-202).
 {¶ 24} Tracy Snyder testified that a male caller scheduled an appointment for Tra for November 29, 2004. (Id. at 275). However, the appointment was rescheduled by a male caller for December 2, 2004. (Id. at 276). Snyder testified *Page 20 
that Tra missed his appointment on December 2. Detective Wagner testified that Jack told him about the injury to Tra's leg. Wagner stated:
 He told me there was one incident that happened, he said it was about two, two and [a] half weeks prior to the interview. He uh told me that he was walking up to the uh porch, he put Tra on the top step, and at which time he let go of Tra, he had some packages and he was getting his keys and went inside the house. When he put the stuff down inside the house he heard Tra cry, came outside, and found Tra on the sidewalk face down.
(Id. at 299). Wagner investigated at Stephanie's home, noticed a loose railing, and measured the distance from the top of the porch to the sidewalk; a total of 13 inches. (Id. at 301-303). Jack told Wagner that he was supposed to take Tra to the doctor on December 2 because of the injury to Tra's leg, but he overslept and missed the appointment. (Id. at 303).
 {¶ 25} Chris Glick testified that he observed Tra dragging his leg when he helped Jack paint cabinets on December 1, 2004. (Id. at 353). Glick also testified that he lived near Stephanie's home, and on the morning of December 2, 2004, at sometime between the hours of 8:00 a.m. and 9:00 a.m., he observed Jack's brother's truck at Stephanie's home. (Id. at 348). Glick stated that he noticed the front door was open. (Id.). Glick testified that he knew Tra had a doctor's appointment that morning, so he asked Jack why he did not go to the doctor. Jack told Glick that his brother had stopped by to pick up the vacuum cleaner and that he had overslept and missed Tra's appointment because Stephanie had forgotten to *Page 21 
set the alarm. (Id. at 349). Jack apparently told Glick, "he would blame it on Stephanie that she didn't set the alarm for him to get up in time," and Glick found that statement to be unusual. (Id. at 350).
 {¶ 26} John Manns testified that he observed Tra limping at one point. (Id. at 371). Jack told John that Tra had fallen off of the porch because of the loose railing. (Id.). Finally, Scribano testified that the fractures on Tra's leg were sub-acute, meaning they had occurred between seven and 21 days prior to his exam. (Id. at 411). Again, Scribano testified that Tra was the victim of abuse and although he could not state how the injuries occurred, he was certain they were not accidental. (Id. at 415; 437).
 {¶ 27} The facts as to counts three and four were clear. Tra sustained fractures and injuries to his left foot, which caused him to limp for at least a week before he was taken to the hospital. The injury occurred during a time when only Jack had access to the child. Again, Jack's explanation of the injury seems plausible; however, the jury could have easily disbelieved him in light of Scribano's testimony and after viewing the physical evidence depicting Tra's injuries and Stephanie's porch. If the jury disbelieved Jack's explanation, which it apparently did, it could have easily found that Jack recklessly created a substantial risk of harm to Tra's health or safety. This is true particularly in light of the evidence that Jack failed to take Tra to the hospital or to any doctor between the *Page 22 
time he first began to limp, on or about November 25, 2004, and the time Stephanie took him to St. Rita's Medical Center on December 5, 2004. On these facts, there was sufficient evidence to support the convictions for counts three and four. See Flory, at ¶ 7; State v. Evans (1994),93 Ohio App.3d 121, 637 N.E.2d 969, citing State v. Legg (1993),89 Ohio App.3d 184, 623 N.E.2d 1263; State v. Sandefur (Aug. 11, 1993), 9th Dist. No. 15787 (convictions for child endangering may be upheld where the people named in R.C. 2919.22(A) did not seek medical attention for the child).
 {¶ 28} The fifth and sixth counts were the result of Tra's other unexplained injuries, notably the broken ribs, lacerated liver, and numerous other bruises. Again, Stephanie testified that Jack was Tra's sole caretaker when she was at work. Stephanie testified that on December 4, she intended to, but did not, take Tra to the hospital because Jack told her that "they" would take Tra away from her. (Trial Tr., at 179). Stephanie stated that she took Tra to the hospital on December 5 because he had not slept, would not eat, and was vomiting. (Id. at 181). At St. Rita's, Stephanie discovered the extent of Tra's injuries. (Id. at 208).
 {¶ 29} As mentioned above, Jack told Detective Wagner he did not believe Stephanie would have injured Tra. (Id. at 293). The medical testimony offered by Scribano has been set forth above in the discussion of whether Tra suffered serious physical harm. On this record, there was sufficient evidence to support *Page 23 
convictions on counts five and six. Although there was no evidence explaining exactly how Tra came to have the broken ribs or the lacerated liver, Scribano's testimony was clear that Tra's injuries, particularly the lacerated liver, were caused by abuse. Jack admitted to Wagner that none of the people he and Tra visited could have injured Tra because he was always present. (Id. at 293-294). The only evidence in the record is that Tra suffered various inflictions between the times Stephanie saw him before work and the times she arrived home from work.
 {¶ 30} We note that in State v. Miley (1996), 114 Ohio App.3d 738,684 N.E.2d 102, the Fourth Appellate District refused to uphold a conviction for child endangering where the state produced circumstantial evidence establishing that the child had been abused, and that the defendant was one of only two people who had access to the child. However, one of the key factors in that case was the fact that none of the child's injuries were external, which would have alerted the defendant to the fact that the child had been abused. In this case, we have a different scenario. Perhaps the broken ribs could not have been realized, but by the time Tra became seriously ill on Friday, December 3, 2004, his condition was noticeable and apparently worsened until he was taken to the hospital on Sunday, December 5, 2004. Also unlike Miley, we have admissions from the defendant that none of his friends caused injury to Tra and that Stephanie did not cause injury to Tra, but he could not explain how Tra was injured and simply denied any *Page 24 
involvement. The evidence shows that Tra was relatively healthy when Stephanie went to work, but was injured when she returned. There is also evidence that Jack attempted to dissuade Stephanie from taking Tra to the hospital on December 5 by telling her that "they" (apparently meaning Children's Services) would take her child away from her. On this record, there was sufficient evidence for a jury to find beyond a reasonable doubt that Jack recklessly created a substantial risk of harm to Tra's health or safety.
 {¶ 31} The seventh count was based on the "water incident." The only evidence concerning the "water incident" was Chris Glick's testimony. On December 1, 2004, Jack asked Glick to help him paint kitchen cabinets at Jack's brother's house. Glick testified that he was responsible for masking off the cabinets, and while he did so, Jack followed behind with the paint. At some point, Glick noticed that Tra had gotten into the paint, so he told Jack and went back to his work. (Trial Tr., at 344). Glick testified that Jack:
 went around and picked [Tra] up by his right arm, swatted him on his butt three times, took him over, got him undressed. I proceeded back to taping off and I heard the water come on then and as I heard Tra crying, I noticed that there was a different tone in his crying. As I looked around the corner, Jack had him under the water, and when I looked around the corner then he started wiping him off with a dish rag.
(Id. at 344). Glick stated that the different tone he heard was a "gurgling," and he stated that he saw Jack holding Tra's head under the water "face up." (Id. at 344-345). *Page 25 
After further questioning, Glick testified, "when I looked, at the time, he was pulling [Tra] out from under the water and washing him off with the wash rag." (Id. at 345). Glick stated that the entire episode with the water lasted around two minutes, and Tra's gurgling lasted approximately a "couple seconds." (Id. at 346). Glick testified that he has several children, and he did not see a need to seek medical help afterwards. (Id. at 354).
 {¶ 32} On this record, there was insufficient evidence to prove that Jack recklessly created a substantial risk of harm to Tra's health or safety by washing him off in the manner he did. Glick testified that the entire incident lasted approximately two minutes, but that Tra only "gurgled" for a "couple seconds." While Jack could have engaged in a better method of washing the child, we cannot find Jack was reckless. The evidence was not clear whether Jack dunked Tra's head in a tub of water or if he held Tra's head under a stream of water from the faucet. However, dunking a child under water for a "couple seconds," while probably not the best way to wash the child's face, is comparable to taking the child in the swimming pool and putting him under water or dunking a child to wash shampoo from his hair during a bath. Furthermore, there was merely a remote risk, rather than a "strong possibility" that Tra's health or safety would have been at risk by Jack engaging in this behavior. On this record, the evidence was insufficient to sustain a conviction for child endangering on count seven. *Page 26 
 {¶ 33} In count nine, Jack was charged with child endangering because of the bump Tra sustained to the right side of his head. Stephanie testified that she took Tra to the emergency room at Lima Memorial Hospital after she noticed the bump on his head in October 2004. (Trial Tr., at 238). At that time, Jack did not object to her taking Tra to the emergency room, although he chose not to accompany her. (Id. at 239). Stephanie also indicated that the emergency room doctor did not order x-rays and merely sent her home after telling her that the lump would go away in a few days. Millie Brown testified that she observed the golf ball-sized lump on Tra's head in October, and she went to the hospital with Stephanie and Tra. (Id. at 322-323). John Manns testified that he saw the lump on Tra's head, and Jack told him Tra had fallen off of the gliding footstool. (Id. at 370). John admitted that Tra could have easily taken such a fall because he had seen Tra standing on the footstool before. (Id. at 371). Scribano did not identify any injuries to the right side of Tra's head, other than some unexplained bruising.
On this record, there was insufficient evidence to prove Jack's conviction on count nine. Although Jack found ways to explain many of Tra's injuries, those injuries were noted by Scribano during Tra's examination at Children's Hospital or were evidenced on the CAT scan completed at St. Rita's, and Scribano opined that Tra's noted injuries were not accidental. Here, Scribano did not observe or apparently have any record of the lump on the right side of Tra's head. Therefore, *Page 27 
his opinion cannot be extended to an event that happened approximately one and one-half to two months prior to his examination of Tra. Furthermore, the only evidence in the record shows that Tra fell off of a footstool and sustained a bump on his head. The emergency room doctor who treated Tra for that injury seemed unconcerned, and it is common knowledge that mobile eighteen-month-old toddlers are notorious for quickly getting into dangerous situations that result in scratches, bruises, and bumps despite the caretaker's most vigilant attempts to prevent any harm. There was absolutely no evidence on this record to demonstrate that Jack recklessly created a substantial risk of harm to Tra's health or safety. Therefore, the conviction on count nine must be reversed. In accordance with the above analysis, Jack's first assignment of error is sustained. The convictions on counts seven, nine, and ten are reversed, and the convictions on counts one through six are sustained.
 {¶ 34} In the second assignment of error, Jack contends his convictions are against the manifest weight of the evidence. Unlike sufficiency of the evidence, a challenge based on the manifest weight of the evidence requires the court to sit "as a "`thirteenth juror.'"Thompkins, 78 Ohio St.3d at 387, quoting Tibbs, 457 U.S. at 42.
 Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their *Page 28 verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."
(Emphasis added.). Id. at 387, quoting Black's Law Dictionary (6 Ed. 1990), at 1594. When an appellant challenges a conviction based on the weight of the evidence, the court must review the entire record, weigh the evidence and "all reasonable inferences," consider witness credibility, and determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E .2d 717. To reverse a conviction based on the manifest weight of the evidence, a unanimous panel of three appellate judges must concur. State v. Michaels, 3d Dist. No. 13-99-41, 1999-Ohio-958, citing Thompkins, at 389. Under this standard, we must determine whether Jack's convictions for child endangering on counts one through six are supported by the weight of the evidence.
 {¶ 35} The state's evidence on each count is adequately set forth above. At trial, Jack produced testimony from several witnesses. Todd Scott, Jack's brother, testified that he saw Jack and Tra either three or four times per week for approximately four hours each day. (Trial Tr., at 446; 455). Todd testified that Tra usually would not play with him, but readily went to Jack. (Id. at 447). Todd *Page 29 
stated that he never saw Jack physically discipline the child, and that he never saw anything that led him to believe Jack was abusing Tra. (Id. at 448; 453).
 {¶ 36} Casey Phipps, Jack's friend, testified that he saw Jack with Tra approximately six to seven times per week. Casey testified that Tra was always friendly to Jack, and he never observed any physical violence. (Id. at 462). Casey testified that Tra was a "clumsy kid" and fell down a lot. (Id. at 466). However, when Casey saw Tra on December 3, 2004, he thought Tra looked ill. (Id. at 464). Casey testified that Jack called him on December 4, and stated he was worried about Tra being sick. (Id. at 466; 468).
 {¶ 37} Whitney Anderson, Casey's daughter, testified that she saw Tra and Jack approximately one time per week. (Id. at 479). Whitney testified that she did not see any problems or concerns with Jack and Tra's relationship. (Id.). Whitney also stated that on December 4, 2004, Tra was ill and Jack was worried. (Id. at 480).
 {¶ 38} Finally, Terry Phipps, Casey's wife, testified. Terry testified that she saw Tra with Jack approximately one to two times per week. (Id. at 482). Terry stated that Tra was not afraid of Jack, and she had never witnessed Jack engage in any "inappropriate" behaviors. (Id. at 484). On cross-examination, Terry admitted that she observed Tra and Jack together for a maximum of four hours per week at her home. (Id. at 485). *Page 30 
 {¶ 39} All of the evidence presented by Jack indicates only that other people did not observe Jack engaging in any abusive behavior toward Tra. However, none of those people were with Jack and Tra 24 hours per day. Jack's witnesses were essentially character witnesses and provided no substantial evidence in his favor. On this record, the jury apparently opted to believe the state's witnesses, including Scribano's expert testimony, and determined that Jack had engaged in child endangering. Because issues of witness credibility and weight of the evidence are better left to the trier-of-fact, we defer to the jury's findings.State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212. The second assignment of error is overruled.
 {¶ 40} In the third assignment of error, Jack contends he had the ineffective assistance of trial counsel. Jack claims that counsel's stipulations and failure to object to evidence about Tra's death fell below an objective standard of representation. Jack alleges that stipulating to the child's death, when he was not charged with any offense for the child's death, and allowing the jury to hear such evidence, coupled with evidence concerning his prior convictions, was highly prejudicial and contained little, if any, probative value.
 {¶ 41} In response, the state contends that defense counsel had nearly thirty years of experience and merely made a tactical decision to make the stipulations he did. The state argues that the stipulations were designed to limit the jury's *Page 31 
imagination because many of Tra's medical records, which were admitted into evidence, contained references to his death. The state alleges that even if the court had redacted any inference to Tra's death from the medical records, the jury would have inferred the ultimate outcome, which would have resulted in jury speculation and prejudice to the defendant. The state contends that defense counsel simply made a wise tactical decision to mitigate any damage his client would face once the jury deduced that the child had ultimately died.
 {¶ 42} To establish ineffective assistance of counsel, a defendant must show that "(1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defense." State v. Price, 3d Dist. No. 13-05-03, 2006-Ohio-4192, at ¶ 6, citing State v. Kole, 92 Ohio St.3d 303, 306, 2001-Ohio-191,750 N.E.2d 148, quoting Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 80 L.Ed.2d 674. In proving that the defendant was prejudiced by counsel's actions, the appellant must demonstrate that "there is a reasonable probability that, but for counsel's performance, the result of the proceeding would have been different." Id. at ¶ 6, citing Strickland, at 694. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." State v. Loza (1994), 71 Ohio St.3d 61,83, 641 N.E .2d 1082, citing Strickland, at 697. *Page 32 
 {¶ 43} To prove that an attorney's conduct was deficient or unreasonable, the appellant "must overcome the presumption that the attorney provided competent representation, and show that the attorney's actions were not trial strategies prompted by `reasonable professional judgment.'" State v. Scott-Hoover, 3d Dist. No. 3-03-20, 2004-Ohio-97, at ¶ 7, quoting Strickland, at 687. Attorneys licensed in Ohio enjoy a strong presumption of competence, and "tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance." Id., citing State v. Sallie, 81 Ohio St.3d 673,675, 1998-Ohio-343, 693 N.E.2d 267; State v. Carter (1995),72 Ohio St.3d 545, 558, 651 N.E.2d 965. "Instead, the errors complained of must amount to a substantial violation of defense counsel's essential duties to his client." Id., citing State v. Bradley (1989), 42 Ohio St.3d 136,141, 538 N.E.2d 373, quoting State v. Lytle (1976), 48 Ohio St.2d 391,396, 358 N.E.2d 623.
 {¶ 44} The first stipulation the parties entered into stated:
 All parties stipulate that the defendant, Jack W. Scott, is not on trial for causing the death of Tra Manns. Rather, the defendant is charged with Endangering Children, to wit: Tra Manns, and he is not accused of causing his death. Further, the parties stipulate that Tra Manns died on December 7, 2004 at 3:29 p.m. in Children's Hospital in Columbus, Ohio.
(Journal Entry of Stipulations, Apr. 17, 2007, at 1). Clearly, counsel's decision to enter into the stipulation was a tactical decision, meant to stem any speculation or implications raised by the evidence. The evidence presented at trial was simply *Page 33 
that Tra died, and at some point a staph infection was referenced; however, none of the witnesses made highly prejudicial statements such as, "Jack killed Tra." Although the evidence of Tra's death was not relevant to proving the elements of endangering children, his medical records did contain numerous references to his death, which the jury could have reasonably deduced, even if the information had been redacted.
 {¶ 45} Defense counsel apparently took the steps he deemed necessary to mitigate any prejudice the jury may have felt toward Jack. The parties carefully crafted the stipulation to ensure that the jury clearly understood that the charges against Jack were based solely on child endangering and not murder. On this record, we cannot find that counsel's performance was unreasonable or deficient, and even if it were, we cannot find that Jack suffered any prejudice as a result of counsel's performance. As set forth above, the evidence was clear on counts one through six that Jack had endangered Tra's health and safety. Even without the evidence of Tra's death, which we did not consider above, the jury could have easily convicted Jack on counts one through six on the evidence presented by the state's witnesses. The third assignment of error is overruled.
 {¶ 46} In the fourth assignment of error, Jack contends the trial court erred when it imposed consecutive, maximum sentences. Jack argues that the court was required to consider the principles and purposes of felony sentencing set forth in *Page 34 
R.C. 2929.11 and to balance the recidivism and seriousness factors of R.C. 2929.12. Jack contends that the evidence "identifying" him "as the perpetrator was scant at best, and should have been considered by the trial court in imposing sentence."
 {¶ 47} The state responds, arguing that the trial court did not err. The court stated in its judgment entry that it had considered R.C.2929.11 and 2929.12, and the state contends that pursuant to State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, the trial court was not required to make findings or state reasons for imposing maximum and/or consecutive sentences. The state claims that the trial court gave reasons for the sentences imposed, which clearly shows that the court considered the principles and purposes of felony sentencing and the recidivism and seriousness factors.
 {¶ 48} At sentencing, the trial court determined that counts one, three, five, and nine were allied offenses of similar import and merged those offenses with counts two, four, six, and ten. The court then imposed four, consecutive, five-year prison terms for counts two, four, six, and ten and an eighteen-month sentence on count seven; an aggregate prison term of twenty-one years and six months. Consistent with our opinion, the sentences on counts six, seven, and ten are reversed, leaving an aggregate prison term of fifteen years on counts two, four, and six. *Page 35 
 {¶ 49} The state is correct that Foster allows trial courts to impose maximum and consecutive sentences without stating findings or reasons; however, the court also held that trial courts must sentence within the applicable statutory range and follow the procedures established in R.C.2929.19. State v. Foust, 3d Dist. No. 3-07-11, 2007-Ohio-5767, at ¶ 26, citing State v. Mathis, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, at ¶ 37; State v. Wentling, 3d Dist. No. 16-06-03, 2007-Ohio-217. A trial court is still required to consider the principles and purposes of felony sentencing set forth in R.C. 2929.11 and to balance the recidivism and seriousness factors found in R.C. 2929.12. Id., at ¶ 27, citing State v. Smith, 3d Dist. No. 2-06-37, 2007-Ohio-3129, at ¶ 26, citing Mathis, at ¶ 38. However, the trial court is not required to discuss the factors on the record or even to state on the record that it has considered the statutory language. Id., citing R.C. 2929.12;State v. Sharp 10th Dist. No. 05AP-809, 2006-Ohio-3448; State v.Gant, 7th Dist. No. 04-MA-252, 2006-Ohio-1469; State v. Hughes 6th Dist. No. WD-05-024, 2005-Ohio-6405; State v. McAdams, 162 Ohio App.3d 318,2005-Ohio-3895, 833 N.E.2d 373; State v. Patterson 8th Dist. No. 84803,2005-Ohio-2003; State v. Amett, 88 Ohio St.3d 208, 205, 2000-Ohio-302,724 N.E.2d 793; and State v. Polick (1995), 101 Ohio App.3d 428, 431,655 N.E.2d 820.
 {¶ 50} The record supports Jack's sentence. At the sentencing hearing, held on May 3, 2007, the state called Sherry Jarrell to testify. During her testimony, *Page 36 
the state submitted into evidence a letter written by Jack to Jarrell from prison requesting that she sell her truck to obtain bond money for him and stating that he would live with her and her two children if he were released on bond. The state argued that such statements were indicative of Jack's disregard for court orders prohibiting him from living in a home with children under the age of 18. The state also submitted into evidence, a recording of a phone call Jack made to Jarrell from prison. The state's argument at sentencing focused on Jack's prior criminal history, as evidenced in the pre-sentence investigation report, and the factual history of the instant matter. A victim's advocate read a written statement Stephanie had prepared, and the defense was given the opportunity to speak in mitigation. Defense counsel presented argument on restitution, and Jack told the court he had "nothing to say at this time."
 {¶ 51} When it imposed sentence, the trial court stated that it had considered the state's evidence, the victim's statement, the pre-sentence investigation report, and the arguments made in court. (Sentencing Tr., Aug. 7, 2007, at 42). The court went on to state:
 Mr. Scott in the past you've been involved or implicated in the injury and[/]or deaths of at least two other children about the same age as the victim in this case. You've shown no remorse, nor have you accepted any responsibility for any injuries to any of these children. But it seems odd to the Court that whenever you are around small children, that the children suffer harm and death. This Court cannot accept your position that someone else was the cause of the injuries in this case. The only common *Page 37 denominator in these cases is the presence of you. And this Court cannot believe such a fact is a mere coincidence or as the Defendant contends, or as you contend, that there is some big conspiracy against you.
 *.*.*
 The Court firmly believes that you, Mr. Scott, should face the maximum allowable penalties provided for in this case.
 *.*.*
 Mr. Scott the only reason why you did not receive more time in prison in this case is because the law does not provide for same. But would that I could, you would never be free to harm another child. I read from the pre-sentence report. The Defendant is a serious risk to the public in general and children specifically. His continued criminal behavior and suspicious involvement with abused children and their deaths cannot be ignored. You are a sociopath, perhaps even a psychopath, without conscience, and society needs to be protected from you. You are going to be incarcerated for a long time, and that is exactly where you belong.
(Id. at 42-43; 48). Additionally, in its judgment entry of sentence, the court wrote that it had considered "the principles and purposes of sentencing under Ohio Revised Code Section 2929.11, and has balanced the seriousness and recidivism factors in Ohio Revised Code Section 2929.12." (Entry of Sentence, May 9, 2007, at 2).
 {¶ 52} Therefore, "although the trial court was not required to set forth its specific findings, nor was it required to specifically state that it considered each of the subsections of R.C. 2929.11, R.C.2929.12, or R.C. 2929.13 pursuant to *Page 38 Foster, and Smith, * * * the record clearly evinces that the trial court considered the requisite factors of R.C. 2929.12" and R.C. 2929.11 in imposing Jack's sentence. The record clearly and convincingly supports Jack's sentences on counts two, four and six, which are not otherwise contrary to law. The fourth assignment of error is overruled.
 {¶ 53} Consistent with this opinion, the judgment of the Hardin County Common Pleas Court is affirmed in part and reversed in part.
Judgment affirmed in part and reversed in part.
 PRESTON and ROGERS, JJ., concur.
[1] These counts were specifically numbered as Counts One, Three, Five, Seven, Nine and Eleven in the indictment.
[2] These counts were specifically numbered as Counts Two, Four, Six, Eight, Ten, Twelve, and Sixteen in the indictment.
[3] These counts were specifically numbered as Counts Thirteen and Fifteen in the indictment.
[4] This count was designated as Count Fourteen.
[5] This charge was designated as Count Seventeen. *Page 1