[Cite as *State v. Klose*, 2010-Ohio-5674.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO.  5-10-12

    v.

RONALD J. KLOSE,                       O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Hancock County Common Pleas Court
Trial Court No. 2009 CR 45

Judgment Affirmed

Date of Decision:   November 22, 2010

APPEARANCES:

    *Scott T. Coon*  for Appellant

    *Drew A. Wortman*  for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant, Ronald J. Klose, appeals the judgment of the Hancock County Common Pleas Court, finding him guilty of eleven counts of unlawful sexual conduct with a minor and sentencing him to an aggregate term of thirteen years in prison. On appeal, Klose contends that the trial court erred in denying his motion to suppress his statements, erred in denying his motion to suppress the evidence found in his vehicle, and erred in sentencing him to a term of thirteen years in prison. For the reasons set forth herein, we affirm the judgment of the trial court.

{¶2} On December 15, 2008, Deputy Rodney Griffin of the Hancock County Sheriff's Office was on routine patrol in Marion Township in the Deer Landing sub-division at approximately 7:30 p.m. when he spotted a vehicle parked off the roadway on an unlit, dead end street. Dep. Griffin was patrolling the area because it was a newer housing development and Marion Township had been experiencing a number of break-ins and thefts from new homes that were under construction. Dep. Griffin drove towards the vehicle and stopped his patrol car approximately two car lengths in front of the vehicle and shined his spotlight on the darkened vehicle. He observed Klose in the driver's seat. Dep. Griffin then noticed Klose begin moving and bending over as if to pull something up. He also

noticed a second white male located in the back seat, and he saw this person reach over the front passenger seat and pull a pair of pants into the back.

{¶3} Dep. Griffin exited his patrol car so that he could approach the vehicle. At this point, Klose started the vehicle and began to drive away. Dep. Griffin waved his arms and flashlight, signaling Klose to stop, and Klose complied. Klose then rolled down his window, and Dep. Griffin asked him for identification. Dep. Griffin noticed several pornographic magazines below Klose's feet on the floorboard. Klose appeared nervous, was shaking, and was breathing heavily. The belt on his pants was also unfastened. Upon looking at the passenger, Dep. Griffin thought he was a juvenile. In addition, Dep. Griffin noticed that the passenger was sitting with his arms crossed over his knees, bent over, and with his pants only pulled up to his knees.

{¶4} Both Klose and his passenger produced identification. The passenger turned out to be Klose's fourteen-year-old nephew. Dep. Griffin had the nephew exit the vehicle, whereupon he noticed that the nephew was not wearing any shoes. The nephew pulled his pants up, and Dep. Griffin spoke to him inside of the patrol car while Klose was told to remain in his own vehicle. Once inside the patrol car, the nephew stated that he did not want to get Klose into trouble and revealed that Klose had been performing fellatio on him inside of the vehicle prior to the deputy arriving.

{¶5} Dep. Griffin called for an additional officer and also requested that Detective Thomas Blunk[1] and Children's Services be contacted due to the age of the nephew and what he told Dep. Griffin. A back-up officer arrived, and Klose was asked to step out of his vehicle and was informed that he was going to be taken to the sheriff's office for further investigation. Klose was then patted down for weapons, handcuffed, and placed in Dep. Griffin's vehicle.

{¶6} The deputies conducted an inventory of the contents of Klose's vehicle because it was being impounded. Inside the vehicle, the deputies found a number of pornographic magazines under the floor mat on the driver's side floorboard, although these magazines had been on top of the floor mat when Dep. Griffin first noticed them. After the inventory, Klose and his nephew were taken to the sheriff's office. The nephew was then taken to the Center for Safe and Healthy Children in Findlay, Ohio, where he was interviewed by Det. Blunk.

{¶7} After interviewing the child, Det. Blunk and Dep. Griffin returned to the sheriff's office to interview Klose. Prior to questioning Klose about his conduct with his nephew, Det. Blunk provided Klose with a Miranda rights form and asked him what was the highest grade in school that he had completed. Klose stated that he completed 12th grade. Det. Blunk then had Klose read the form aloud. Klose read the form as requested and stated that he understood what he had

---

[1] Det. Blunk testified that he holds the title of both detective and sergeant and that either characterization of him was appropriate. For purposes of this opinion, we elect to refer to him as Det. Blunk.

-4-

read. Det. Blunk further asked Klose if he understood that he had the right to an attorney and that he did not have to talk to Det. Blunk. Klose indicated that he understood, he had no questions, and agreed to speak with Det. Blunk. He then signed the form and spoke with Det. Blunk.

{¶8} During his interview with Det. Blunk, Klose stated that he picked his nephew up after school, had dinner with him, drove around, and then parked in the Deer Landing sub-division. He further admitted that he brought the magazines for his nephew to view and that he performed fellatio on his nephew while his nephew looked at the magazines. He then allowed his nephew to have anal intercourse with him and once again performed fellatio on his nephew. Klose explained that he returned to the front seat and was cleaning himself up when Dep. Griffin arrived. Klose also stated that he had engaged in this type of activity with his nephew on a weekly basis beginning in October of that year but that they had engaged in similar activity on a sporadic basis since June of 2008.

{¶9} At the conclusion of the interview, Klose provided a written statement that included many of the details he provided to Det. Blunk. Det. Blunk asked him a few more questions, which he answered, and the interview was concluded.

{¶10} On February 24, 2009, Klose was indicted on eleven counts of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A), each a

felony of the third degree. Klose pled not guilty to each count. Thereafter, Klose filed a motion to suppress all evidence obtained as a result of the stop of his vehicle and to suppress his statements to law enforcement because he was not competent to waive his Miranda rights.

{¶11} Klose was evaluated by Dr. Jolie Brams, a clinical psychologist, at the request of Klose's attorney in order to determine his ability to voluntarily and knowingly waive his Miranda rights. Dr. Brams issued a report, opining that Klose "did not possess the developmental or cognitive abilities to knowingly and voluntarily waive his right to counsel." (Supp. Hrg., 10/8/09, Def. Exh. A.) In response, the State requested that Klose be given an evaluation by the Court Diagnostic and Treatment Center ("CDTC") in Toledo, Ohio. The trial court granted this request, and Dr. Thomas Sherman, a psychiatrist and medical director of the CDTC, evaluated Klose. Dr. Sherman issued a report of this evaluation, opining that Klose was competent to waive his Miranda rights at the time he was questioned by Det. Blunk.

{¶12} On October 8, 2009, a suppression hearing was held. Both Dr. Brams and Dr. Sherman testified and presented their respective opinions. In addition, Dep. Griffin and Det. Blunk testified about what transpired on December 15, 2008. At the conclusion of the hearing, the trial court took the matter under advisement, and on October 27, 2009, overruled the motion to suppress.

{¶13} Klose withdrew his previously tendered pleas of not guilty and entered pleas of no contest on all eleven counts on February 1, 2009. The trial court found him guilty of each count and ordered a pre-sentence investigation, including a pre-sentence evaluation by the CDTC. On March 29, 2010, the court sentenced Klose to four years in prison on each of Counts 1-6, each to run concurrently to one another; five years in prison on each of Counts 7 and 8, each to run concurrently to one another but consecutively to Counts 1-6; and four years in prison on each of Counts 9-11, each to run concurrently to one another but consecutively to Counts 1-8, for an aggregate term of thirteen years in prison.

{¶14} Klose now appeals the judgment of the trial court, raising three assignments of error.

### First Assignment of Error

**The trial court erred in denying Appellant's motion to suppress statements made by the appellant at the time of Appellant's arrest.**

### Second Assignment of Error

**Trial court erred in denying Appellant's motion to suppress evidence illegally seized from his motor vehicle by the Hancock County Sheriff's Department at the time of his arrest, and statements made after the appellant's arrest to the Hancock County Sheriff's Office.**

## Third Assignment of Error

**Trial court erred in sentencing the appellant to a term of thirteen (13) years in the Ohio Department of Rehabilitation and Correction.**

{¶15} For ease of discussion, we elect to address the assignments of error out of the order in which they appear.

{¶16} In Klose's second assignment of error, he maintains that the trial court erred in denying his motion to suppress the evidence obtained as a result of the stop of Klose. In support of this position, Klose contends that Dep. Griffin did not have a reasonable articulable suspicion of criminal activity to justify stopping him.

{¶17} When reviewing a trial court's ruling on a motion to suppress, the Supreme Court of Ohio has determined that:

> **"Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning* (1982), 1 Ohio St.3d 19, [20], 1 OBR 57, 437 N.E.2d 583. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. *State v. McNamara* (1997), 124 Ohio App.3d 706, 707 N.E.2d 539."**

*In re: A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 50, quoting

*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

{¶18} The United States Supreme Court has previously held that "[t]he Fourth Amendment [of the United States Constitution] provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *.' This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." (Emphasis added.) *Terry v. Ohio* (1968), 392 U.S. 1, 8-9, 88 S.Ct. 1868. Similar protection exists pursuant to Section 14, Article I of the Ohio Constitution. See *State v. Wilson*, 3rd Dist. No. 5-07-47, 2008-Ohio-2742, ¶ 16. When evidence is obtained as a result of an unlawful search and seizure, it must be suppressed. *Id.*, citing *Mapp v. Ohio* (1961), 367 U.S. 643, 649, 81 S.Ct. 1684.

{¶19} In *Terry*, the Supreme Court determined that an officer need not have probable cause to detain and search an individual. *Terry*, 392 U.S. at 21. Rather, a police officer may temporarily detain an individual where he has a reasonable articulable suspicion that the individual is engaging in criminal activity. *State v. Bobo* (1988), 37 Ohio St.3d 177, 179, 524 N.E.2d 489, citing *Terry*, supra. Reasonable articulable suspicion exists when there are "'specific and articulable facts which, taken together with rational inferences from those facts,

reasonably warrant the intrusion.'" *State v. Stephenson*, 3rd Dist. No. 14-04-08, 2004-Ohio-5102, ¶ 16, quoting *Bobo*, 37 Ohio St.3d at 178, 524 N.E.2d 489. In forming reasonable articulable suspicion, law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu* (2002), 534 U.S. 266, 273, 122 S.Ct. 744, quoting *United States v. Cortez* (1981), 449 U.S. 411, 417-418, 101 S.Ct. 690. Thus, determining whether the officer's actions were justified depends upon the totality of the circumstances, which must "be viewed from the eyes of the reasonable and prudent police officer on the scene who must react to the events as they unfold." *State v. Andrews* (1991), 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (citations omitted).

**{¶20}** We believe that the facts support a reasonable articulable suspicion by Dep. Griffin that Klose was engaged in criminal activity. Dep. Griffin was an experienced deputy with five and a half years on the Hancock County Sheriff's Department and seventeen years in overall law enforcement experience. We must view the circumstances of the stop through his eyes. He was the "reasonable and cautious police officer on the scene" who was guided by his own experience and training. See *State v. Freeman* (1980), 64 Ohio St.2d 291, 295, 414 N.E.2d 1044.

{¶21} Dep. Griffin testified that Hancock County had been experiencing a number of break-ins in homes under construction in newer housing developments. In fact, he testified that Marion Township, where Deer Landing is located, actually contracted with the Sheriff's Department for additional patrols in the township because of the number of these types of break-ins. He also testified that Deer Landing was a newer housing development and that he was patrolling it because of this specific concern. An area's reputation for criminal activity is an articulable fact, which is a part of the totality of circumstances surrounding a stop to investigate suspicious behavior. *Bobo*, 37 Ohio St.3d at 179, 524 N.E.2d 489.

{¶22} While on patrol in the evening hours of December, he noticed an isolated, darkened vehicle at the end of an unlit, dead end street where there were no homes in the immediate vicinity. He then drove towards the vehicle and shined his spotlight on the vehicle "to see if anybody was in the vehicle or why the vehicle was there[.]" (Supp. Hrg., 10/8/09, p. 117.) Dep. Griffin saw a man in the driver's seat, who started to bend over "and was acting like he was moving back and forth like he was trying to pull something up[.]" (id. at pp. 117-118.) He also noticed that the windows were somewhat steamed up and that there was another person in the back seat. He saw this second person then grab a pair of pants from the front and pull the pants to the back seat. At this point, he elected to exit his

patrol car to approach the vehicle but the vehicle began driving away so Dep. Griffin signaled with his hands and flashlight for the vehicle to stop.

{¶23} This case cannot be resolved on the basis of any one of the facts we have detailed. However, when taken collectively, those facts indicate that Dep. Griffin did not violate Klose's constitutional rights in stopping and investigating this suspicious activity. As noted by the trial court, "[w]hen added together, this combined conduct could lead a reasonably prudent person to believe that a break-in had occurred or was in progress; the parties were engaged in unlawful sexual activity, or that other potential criminal activity was afoot." (Journal Entry, 10/27/09, p. 6.)

> **"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. * * * A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."**

*Bobo*, 37 Ohio St.3d at 180, 524 N.E.2d 489, quoting *Adams v. Williams* (1972), 407 U.S. 143, 145-146, 92 S.Ct. 1921. In this case, a brief stop of Klose in order to maintain the status quo momentarily while obtaining more information was reasonable, good police work. Furthermore, once Dep. Griffin saw that the rear seat passenger appeared to be a juvenile whose pants were only pulled up to his

knees, combined with observing the pornographic magazines beneath the feet of the adult driver who had been making furtive movements and who attempted to drive away upon seeing the deputy approach, he was justified in continuing the stop to ascertain whether a crime had occurred  Accordingly, we do not find that the trial court erred in overruling Klose's motion to suppress in this regard, and the second assignment of error is overruled.

**{¶24}** In his first assignment of error, Klose contends that the trial court erred in overruling his motion to suppress the statements he made to law enforcement because he did not knowingly, intelligently, and voluntarily waive his Miranda rights.  In support of his position, Klose asserts that Dr. Brams found that he lacked the abstract reasoning abilities to affect a knowing, voluntary, and intelligent waiver of his Miranda rights.

**{¶25}** The seminal case of *Miranda v. Arizona* requires that "[a] suspect in police custody 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 6, quoting *Miranda v. Arizona* (1966), 384 U.S. 436, 479, 86 S.Ct. 1602.  In order for

a defendant's waiver of Miranda rights to be valid, the waiver must be knowingly, intelligently, and voluntarily made. *Miranda*, 384 U.S. at 444.

{¶26} When a defendant challenges his waiver of these rights, the state bears the burden of demonstrating, by a preponderance of the evidence, that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights based on the totality of the circumstances. *State v. Gumm*, 73 Ohio St.3d 413, 429, 1995-Ohio-24, 653 N.E.2d 253. "The totality of the circumstances includes 'the age, mentality and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *State v. Campbell*, 90 Ohio St.3d 320, 332, 2000-Ohio-183, 738 N.E.2d 1178, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, paragraph two of the syllabus. Absent a showing that the waiver was voluntary, the waiver is invalid and the defendant's statements should be suppressed. *Miranda*, supra.

{¶27} Here, the State conceded at the suppression hearing that Klose was in custody when Det. Blunk questioned him, and the defense did not assert that Klose was threatened, mistreated, or physically deprived by the officers. Rather, the primary issue for the trial court to determine was whether Klose's mental capabilities were sufficient to make a knowing, intelligent, and voluntary waiver of his rights. To that end, Klose and the State presented conflicting evidence.

{¶28} Dr. Brams testified and her report reflected that Klose, who was forty-nine years old at the time she evaluated him, was born with hydrocephalus, a condition where excess fluid builds up in the brain. However, she did not know the extent of the condition, whether it was treated, or the long term effects on Klose, but she noted that his face was asymmetrical, which would indicate he suffered some sort of trauma such as hydrocephalus. She spoke with Klose for several hours, performed various tests on him, spoke with his wife and brother, and reviewed some of his school records and the police reports on this case. She determined that his IQ was 82 and that he was not mentally retarded. Nonetheless, she also opined that he had an overall age equivalent of eight years, three months in cognitive abilities. In explaining this, Dr. Brams stated that Klose had learning disabilities but that he wanted to look intelligent so he used a "cloak of competence," which meant that he would often act as if he understood something even if he did not. She further explained that this was brought on by the relationship with his father, who often compared him to his older brother and was very tough on Klose because of his disabilities. Dr. Brams testified that she based this opinion on her discussions with Klose and his family members because she could not speak with Klose's father who was deceased. Thus, she opined that in waiving his Miranda rights, Klose was simply pretending to understand but did not truly understand what he was doing.

{¶29} On cross-examination, Dr. Brams acknowledged that Klose graduated from Findlay High School. She also provided the school records that she reviewed, which showed that he received average grades in school, but they did not indicate if he was in any type of special education classes. Dr. Brams also provided examples of questions she asked Klose in making her determination that he was a concrete thinker who did not cognitively function as an adult, but none of these examples involved issues of Miranda or anything similar.

{¶30} Contrary to the opinion of Dr. Brams, Dr. Sherman found that there was no indication that Klose was "mentally non-functional" when he waived his Miranda rights. (Supp. Hrg., 10/8/09, State's Ex. 2.) Dr. Sherman also opined that Klose did not suffer from any mental disease or defect that would have prevented him from understanding his Miranda rights. In reaching this conclusion, Dr. Sherman testified that he reviewed Dr. Brams' evaluation, spoke with Klose for one hour, and reviewed the relevant police reports on this matter. Dr. Sherman testified that Klose was able to answer his questions in great detail and on point, told Dr. Sherman that he did not feel that was able to give a voluntary statement to the officers that night because he was scared, and told Dr. Sherman that he believed if he spoke with the officers then things would "go easy." (Supp. Hrg., 10/8/09, pp. 78-79.)

{¶31} Dr. Sherman also testified that "cloak of competence" was not a term of art in forensic psychiatry and that he was unfamiliar with the term. He further stated that Klose had lived independently for a number of years, was able to drive, was married for eleven years, and was gainfully employed for a number of years in places that were not sheltered workshops. In speaking with Klose, Dr. Sherman noted that he did not have to overly simplify his vocabulary in order for Klose to understand and that Klose's thinking was well organized.

{¶32} While speaking with Klose, Dr. Sherman gave him a hypothetical situation involving the robbery of a gas station. This hypothetical included strengths and weakness of the case, and Klose was asked what he would do if he represented the accused. Klose was able to provide a defense strategy, including how to discredit the prosecution's evidence, and Dr. Sherman found that he was able to think in the abstract and that nothing in his answers caused Dr. Sherman to be concerned about Klose's ability to understand.

{¶33} Although Dr. Sherman did not examine any of Klose's medical or school records and did not speak with his family members, he read Dr. Brams' evaluation, which included this information. Additionally, Dr. Sherman stated that he did not feel that he needed to do anything more than what he did in his evaluation because he saw nothing to indicate that Klose was unable to knowingly, intelligently, and voluntarily waive his Miranda rights. In fact, Dr. Sherman

testified that he had evaluated many people for competency over the last thirty years with the CDTC and that if he had "a hint of doubt" about Klose's mental ability to waive his rights, he would have sought additional information. (id. at p. 106.) However, in this case, Dr. Sherman stated "in no uncertain terms" that Klose was competent to waive his Miranda rights and that "this was not even a close call." (id. at p. 102.)

{¶34} In addition to the testimony of both Dr. Brams and Dr. Sherman, Dep. Griffin and Det. Blunk testified about their interactions with Klose on the night of his arrest. Both officers testified that Klose read the Miranda rights waiver form aloud and that Klose did not have any difficulty in reading the form and that they noticed nothing that would have indicated to them that Klose did not understand his rights. Det. Blunk also testified that Klose did not appear to be unable to understand the words that the detective was using or the questions he was asking or otherwise give any indication that he "wasn't with it[.]" (id. at. p. 170.) In addition, Det. Blunk stated that Klose communicated very well with him and although he noticed Klose had some physical deformities, he did not notice anything that indicated that Klose "had some type of mental disability or * * * mental disorder." (id. at. p. 184.) After speaking with Det. Blunk, Klose provided a written statement regarding his sexual activity with his nephew, which he signed.

This statement and the Miranda rights waiver form at issue were submitted into evidence at the hearing.  (id. at p. 188, State's Ex. 4, 5.)

**{¶35}** Based on this evidence, the trial court found that although Dr. Brams' testimony was helpful, the court did not find it sufficiently persuasive to support a conclusion that Klose did not knowingly and intelligently waive his Miranda rights.  Rather, the court found that Dr. Brams' impression of Klose was belied by the fact that Klose was able to have long-term employment, was married, and was able to operate a motor vehicle.  The court also relied upon Dr. Sherman's testimony that Klose was "conversant with legal terms and understood the consequences of certain actions."  (Journal Entry, 10/27/09, p. 9.)  Thus, the court concluded that based upon a totality of the circumstances, the State satisfied its burden of demonstrating that Klose was "not so impaired so as to be incapable of understanding and appreciating the legal rights he possessed at the time he was advised of them by Detective Blunk."  (id.)

**{¶36}** In light of all of the evidence before it, we find that the trial court's decision was supported by an ample amount of competent, credible evidence. Therefore, we do not find that the trial court erred in concluding that Klose knowingly, voluntarily, and intelligently waived his Miranda rights and consequently overruling Klose's motion to suppress in this regard.  The second assignment of error is, accordingly, overruled.

{¶37} Klose asserts in his third assignment of error that the trial court erred in sentencing him to a term of thirteen years in prison. In support of this assertion, Klose points to the fact that he had no prior criminal history and to the pre-sentence evaluation performed by the CDTC, which indicated that Klose was a low risk for recidivism.

{¶38} The standard of review for sentences was set forth in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124. In *Kalish*, four panel members noted that R.C. 2953.08(G) requires an appellate court to review a defendant's sentence, when challenged, to ascertain whether it is clearly and convincingly contrary to law.[2] Clear and convincing evidence is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes* (1986), 25 Ohio St.3d 101, 103-04, 495 N.E.2d 23.

{¶39} Additionally, if the appeal is based upon the application of the factors enumerated in R.C. 2929.12, four panel members in *Kalish* would require a

---

[2] Justices Pfeifer, Lundberg Stratton, Lanzinger, and Judge Willamowski, sitting by assignment, all reached this conclusion.

second step in the sentencing review. This step requires determining whether the trial court abused its discretion in applying these factors, as specifically set forth in R.C 2929.12.[3] An abuse of discretion is more than a mere error; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

**{¶40}** The substance of Klose's assignment of error is that the court did not properly apply the factors set forth in R.C. 2929.12. More specifically, Klose relies upon the fact that he had no prior criminal conviction and that the evaluation he underwent to determine his likelihood of recidivism indicated that he was at a low risk for recidivism. Because Klose's appeal involves R.C. 2929.12, we must review his sentences utilizing the two-step process outlined in *Kalish*.

**{¶41}** As to the first step, in *State v. Foster*, the Supreme Court of Ohio stated, "[t]rial courts [now] have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph seven of the syllabus. Although the trial court is given full discretion in sentencing pursuant to *Foster*, the trial court must consider the overriding

---

[3] Justices O'Connor, Moyer, O'Donnell, and Judge Willamowski, sitting by assignment, concurred in this position, although the first three would use both standards of review in all cases.

purposes of felony sentencing, which are to protect the public from future crimes by the offender and to punish the offender. R.C. 2929.11(A); *State v. Scott*, 3rd Dist. No. 6-07-17, 2008-Ohio-86, ¶ 49, citing *State v. Foust*, 3rd Dist. No. 3-07-11, 2007-Ohio-5767, ¶ 27. Additionally, "[a] sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing * * * commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B).

{¶42} Here, each of the eleven counts was punishable by one to five years in prison. See R.C. 2907.04(A), 2929.14(A)(3). As previously noted, Klose was sentenced to four years on each of Counts 1-6, each to run concurrently to one another; five years on each of Counts 7 and 8, each to run concurrently to one another but consecutively to Counts 1-6; and four years on each of Counts 9-11, each to run concurrently to one another but consecutively to Counts 1-8, for an aggregate term of thirteen years in prison. Each of these sentences was within the permissible statutory range. Further, a review of the record reveals that the trial court considered the purposes and principles of sentencing, as well as the R.C. 2929.12 factors. Thus, we do not find that this sentence was clearly and convincingly contrary to law.

**{¶43}** As to the second step, the trial court outlined the serious nature of the offenses, including the relationship between Klose and his victim and how he groomed his nephew for these offenses by providing him with pornographic magazines, utilizing his inquisitiveness and other aspects of his age and maturity level, and by then driving him to desolate areas of the county to engage in sexual activity. The court noted that this was not "a lark"; it was planned, which indicated that Klose was a pedophile, a conclusion also reached in the CDTC evaluation. (Sent. Hrg., 3/29/10, p. 19; Joint Ex. A.)

**{¶44}** The court also specifically addressed the likelihood of recidivism. In so doing, the trial court found that, despite the risk assessment contained in the CDTC evaluation, there was a potential for recidivism because Klose, a fifty-year-old pedophile, chose to ignore the boundaries of the law and society to fulfill his "unnatural and unlawful instincts" and engage in "a long standing pattern of unlawful conduct with a member of his own family." (id. at p. 21.) The trial court further stated that it was mindful of the possibility of judicial release if it gave a sentence of less than ten years. However, the trial court noted that this was not a case of "one simple offense" but rather it involved eleven separate counts of serious conduct occurring over a period of time and that the sentence needed to adequately punish Klose for his conduct, protect the public, and be proportionate

to the harm caused. (id. at pp. 23-24, 26.) The court then proceeded to sentence Klose as previously detailed.

**{¶45}** In light of the evidence before the court, we do not find that the trial court was arbitrary, unreasonable, or capricious in sentencing Klose on each count in the manner that it chose. A risk assessment for recidivism is but one factor to consider in determining an appropriate sentence. Here, the trial court clearly considered the purposes and principles of sentencing, the seriousness of the conduct, and Klose's likelihood of recidivism, and made a well reasoned decision based upon the evidence before it. Therefore, the third assignment of error is overruled.

**{¶46}** Having found no error prejudicial to Klose, the judgment of the Court of Common Pleas of Hancock County is affirmed.

*Judgment Affirmed*

**ROGERS and PRESTON, J.J., concur in Judgment Only.**

**/jlr**