[Cite as *State v. Johnson* , 2010-Ohio-6064.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                 CASE NO. 3-10-14

    v.

EDWARD L. JOHNSON,                  O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Crawford County Common Pleas Court
Trial Court No. 09-CR-0132

**Judgment Affirmed**

**Date of Decision:  December 13, 2010**

APPEARANCES:

    *J. Sebastian Berger* for Appellant

    *Clifford J. Murphy* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Edward Johnson (hereinafter "Johnson"), appeals the Crawford County Court of Common Pleas' judgment of conviction and sentence. We affirm.

{¶2} On Sunday, August 16, 2009 around 9:46 p.m. Heather Massey called 9-1-1 and reported an unresponsive 20-year-old female in room number 40 at Al Smith's Motel. (Feb. 4, 2009 Tr. at 86-87, 99, 161). Within minutes, Lieutenant Scott Kent of the Crawford County Sheriff's Office responded to the scene and observed a young female, later identified as Jayla Furr (hereinafter "Jayla"), lying on her back on the floor of the room with a raised welt on her right inner forearm indicating a needle mark or injection site. (Id. at 89). Lieutenant Kent also observed Johnson standing in the doorway of the room. (Id. at 87-88). By 9:50 p.m., paramedic Kirk Williamson responded to the scene and immediately began to administer Narcan, a medicine used to counteract any type of opiate overdose, to Jayla. (Id. at 164, 167). Jayla began to regain consciousness on the scene and was transported to Bucyrus Community Hospital, where she was treated for a drug overdose. (Id. at 167). Ciera Reinhart approached Lieutenant Kent at the hospital and informed him that Johnson had provided Jayla with the heroin she used that night and actually helped her inject the drug. (Id. at 112).

**{¶3}** On September 14, 2009, the Crawford County Grand Jury indicted Johnson on count one of drug possession in violation of R.C. 2925.11(C)(6)(a), a fifth degree felony; count two of corrupting another with drugs in violation of R.C. 2925.02(A)(3), a second degree felony; and count three of falsification in violation of R.C. 2921.13(A)(3), a first degree misdemeanor. (Doc. No. 1).

**{¶4}** On September 21, 2009, Johnson entered a plea of not guilty at arraignment, and the trial court appointed him counsel. (Doc. Nos. 4-5). Johnson filed a written plea of not guilty on October 2, 2009. (Doc. No. 6).

**{¶5}** The matter proceeded to a jury trial on February 4-5, 2010. (Doc. No. 11). At the conclusion of all the evidence, the jury found Johnson guilty on all three counts of the indictment. (Doc. Nos. 20-22). On February 19, 2010, the trial court ordered a pre-sentence investigation (PSI) report. (Doc. No. 24).

**{¶6}** On March 22, 2010, Johnson was sentenced to one (1) year imprisonment on count one; seven (7) years imprisonment on count two; and six (6) months imprisonment on count three. (Mar. 31, 2010 JE, Doc. No. 27). The trial court ordered that the terms imposed in counts one, two, and three be served concurrently for an aggregate total of seven (7) years imprisonment. (Id.).

**{¶7}** On April 29, 2010, Johnson filed a notice of appeal. (Doc. No. 34). Johnson now appeals raising three assignments of error for our review. We elect to combine Johnson's first two assignments of error for review.

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED WHEN IT CONVICTED APPELLANT FOR CORRUPTING ANOTHER WITH DRUGS AS SUCH VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE. [TR. PASSIM]**

## ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED WHEN IT CONVICTED APPELLANT FOR CORRUPTING ANOTHER WITH DRUGS BECAUSE THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. [TR. PASSIM]**

**{¶8}** In his first and second assignments of error, Johnson argues that his conviction for corrupting Jayla with drugs was not supported by sufficient evidence and against the manifest weight of the evidence, because the State failed to demonstrate that the heroin was the direct cause of Jayla's "serious physical harm" as required under R.C. 2925.02(A)(3). Johnson points out that Jayla had multiple drugs in her system at the time of her overdose, and the medical expert witnesses would not definitely say the heroin caused the overdose.

**{¶9}** The State, on the other hand, argues that the indictment alleges *alternatively* that Johnson knowingly administered or furnished to Jayla or induced or caused Jayla to use heroin by any means and thereby caused serious physical harm or caused Jayla to become drug dependent. The State argues that it presented ample evidence on both aspects of the charge.

{¶10} When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶11} In determining whether a conviction is against the manifest weight of the evidence, however, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.

{¶12} R.C. 2925.02(A)(3) provides: "[n]o person shall knowingly * * * [b]y any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, *or* cause the other person to become drug dependent[.]" (Emphasis added).

{¶13} The State presented four witnesses at trial. Crawford County Sheriff's Lieutenant Scott Kent testified that he responded to room 40 at Al Smith's Motel around 9:46 p.m. on Sunday, August 16, 2009. (Feb. 4-5, 2010 Tr. at 84-86, 99). Lieutenant Kent testified that he observed Johnson standing by the doorway of the room and a young unresponsive female, later identified as Jayla Furr, lying on her back on the floor when he arrived. (Id. at 88-89). Lieutenant Kent observed a small pool of vomit near Jayla's head as well as a syringe cap lying on the floor near her body. (Id. at 89). Jayla's right inner forearm had a needle or injection site mark as well. (Id.). Johnson consented to a search of the room, and Lieutenant Kent found: a spoon with brown residue on it laying on a table near where Jayla was lying on the floor; some clear capsules with white powdery residue under the bed; and some square pieces of plastic with brown residue, which tested positive for heroin,[1] and aluminum foil in the bathroom trash can. (Id. at 90-92). When Lieutenant Kent asked Johnson what had happened, Johnson informed him that he received a phone call from Heather Massey who wanted to speak with Jayla, but he told Massey that Jayla was asleep and ended the conversation. (Id. at 93). Johnson stated that he tried to wake Jayla up after the phone call, but Jayla would not wake up so he called Massey back and asked her

---

[1] Heroin is "[a] narcotic, prepared from morphine, with strong habit-inducing properties. Heroin has no thereapeutic advantage over other narcotics with less habit-forming tendencies and is, therefore, banned by law from importation and manufacture in the United States." 3 Schmidt, M.D., ATTORNEYS' DICTIONARY OF MEDICINE (Matthew & Bender Company, Inc. 2004) H-117.

to call 9-1-1. (Id.). Johnson also stated that he moved Jayla from the bed to the floor and poured water on her face to wake her, but Lieutenant Kent did not observe any water on Jayla's face or on the floor. (Id.). Lieutenant Kent also testified that Johnson initially denied that anyone in the room had used heroin, and Johnson told him that he did not do heroin anymore. (Id. at 97). Johnson further stated that the last time he had used heroin was two days prior to the incident. (Id.). Lieutenant Kent testified that he observed "track marks" on both of Johnson's arms, indicating heroin use. (Id.).

{¶14} On cross-examination, Lieutenant Kent testified that there have been frequent drug complaints at Al Smith's Motel. (Id. at 99-100). He further testified that he was originally told that the plastic pieces he found in the bathroom trash could have been left by Megan Rumer. (Id. at 100). Lieutenant Kent testified that Paul McGlone, the owner of Al Smith's, told him that Jayla and her boyfriend were staying there for a few nights but that he did not register them to the room. (Id. at 101). Lieutenant Kent also confirmed that Jayla used Ciera Reinhart's cell phone to text message Johnson to ask him to get her more heroin, or she would get it from someone else. (Id. at 104). Lieutenant Kent further testified that Jayla told him that she rented the room from Megan Rumer. (Id. at 110-11).

{¶15} On re-direct examination, Lieutenant Kent testified that Ciera Reinhart approached him at the hospital and told him that Johnson provided Jayla

with the heroin and helped Jayla inject the heroin as well. (Id. at 112, 115). He further testified that Reinhart showed him the text messages between Johnson and Jayla that were on her cell phone. (Id.). Lieutenant Kent's report, which contained the content of these text messages, was admitted into evidence as joint exhibit one. (Id. at 116-17); (Joint Ex. 1).

{¶16} Detective Chad Filliater, a Crawford County Sheriff's Office Detective of twelve years, testified that he was assigned the case and reviewed Lieutenant Kent's report. (Id. at 118-19, 121). Detective Filliater testified that he interviewed Johnson on Wednesday, August 19, 2009, which recorded interview he identified as State's exhibit one. (Id. at 121). After playing the recorded interview in open court, Detective Filliater testified that Johnson admitted to taking heroin on Saturday, August 15th, the day prior to Jayla's overdose, and Johnson admitted to providing Jayla with heroin that same day, as well as helping Jayla inject the heroin. (Id. at 130-31). Detective Filliater also testified that Johnson admitted to providing Jayla with heroin Sunday, after she text messaged him asking for it. (Id. at 132). Johnson also admitted that Jayla and he

took Xanax.[2] (Id. at 133).

{¶17} On cross-examination, Detective Filliater testified that he has been professionally involved in five different drug busts at Al Smith's Motel. (Id. at 137). Detective Filliater denied knowing that McGlone provided Jayla with the spoon they cooked drugs upon. (Id. at 138). When asked what caused Jayla to overdose, Detective Filliater testified that he would assume the combination of alcohol, Xanax, and heroin caused Jayla to overdose. (Id. at 139). Detective Filliater also testified that Jayla told him that Johnson provided her with the heroin on Saturday the 15th, which was her first time using the drug. (Id. at 141). He further testified that Johnson had three different drugs in his system at the time of the police interview, but Detective Filliater insisted that Johnson did not appear to be under the influence of drugs during the interview. (Id. at 143, 147). He also testified that Jayla told him that she obtained the Xanax from Johnson. (Id. at 154, 156). Detective Filliater further testified that Johnson admitted giving Jayla money to purchase liquor. (Id. at 157).

{¶18} Kirk Williamson, a paramedic and supervisor with Lifestar Ambulance, testified that, around 9:46 p.m. on August 16, 2009, he responded to a

---

[2] Xanax is "[t]he brand name of a preparation containing alprazolam, used in the treatment of anxiety." 6 Schmidt, M.D., ATTORNEYS' MEDICAL DICTIONARY (Matthew Bender and Company, Inc. 2004) X-1. Alprazolam is "[a] drug used in the treatment of anxiety and panic disorders usually associated with depression." 1 Schmidt, M.D., ATTORNEYS' MEDICAL DICTIONARY (Matthew Bender and Company, Inc. 2004) A-257.

call for a 20-year-old unresponsive female at room number 40 at Al Smith's. (Id. at 161). When he arrived on the scene, he observed a young female lying on her back unresponsive, blue in color, and breathing two to three (2-3) times per minute. (Id. at 162-63). Williamson also noted a bump on the female's right forearm where it appeared someone had started an IV or needle. (Id. at 163). Williamson testified that he began to administer Naloxone (Narcan),[3] which is a drug used to counteract a suspected opiate overdose. (Id. at 164-66). He testified that they administer Narcan for heroin, Vicodin, and, to a more limited degree, Benzodiazepine[4] overdoses. (Id. at 164). When asked if the young woman would have survived absent medical intervention, Williamson replied, "[a]bsolutely not." (Id. at 166). Once the paramedics began administering Narcan, Jayla began to regain consciousness, and they transported her to Bucyrus Community Hospital. (Id. at 166-67). When asked his opinion as to whether Jayla's condition was a result of heroin use, Williamson stated, "[p]ossibly." (Id. at 168). When asked if Jayla's condition was consistent with heroin overdoses he had seen in the past, Williamson testified, "[y]es." (Id.).

---

[3] Naloxone hydrochloride is "[a] medicinal substance used as an antidote for the effects of an overdose of a narcotic." 4 Schmidt, M.D., Attorneys' Medical Dictionary (Matthew Bender and Company, Inc. 2004) N-9. Narcan is "[t]he trademark name of an injectible medicine used in the diagnosis of a narcotic overdose." Id. at N-13.

[4] Benzodiazepines are "[a] group of drugs whose properties are somewhat similar to those of barbituates but which are much superior. They are the drugs of first choice for the treatment of anxiety and insomnia. The most familiar examples of this group are chlordiazeporide (better known by the brand name Librium) and diazepam (brand name: Valium)." 1 Schmidt, M.D., ATTORNEYS' MEDICAL DICTIONARY (Matthew Bender and Company, Inc. 2004) B-70-71.

{¶19} Dr. David A. Valesquez, an emergency room doctor at Bucyrus Community Hospital for the past three years, testified that Narcan is a medication used to reverse the effects of any narcotic medication. (Id. at 169-72). Dr. Valesquez testified that Narcan is used to restore the patient's consciousness. (Id. at 172). He testified that typical heroin overdose patients: present comatose or unresponsive; pupils tend to be very point formed; can be blue in color; and sometimes experience respiratory arrest. (Id. at 173, 175). Dr. Valesquez identified State's exhibits two and three as medical reports prepared for Jayla Furr. (Id. at 175, 180). Dr. Valesquez testified that Jayla's condition was serious and even life threatening at the time the paramedics arrived on the scene. (Id. at 180-81). The medical report indicates that Jayla's family informed a nurse that Jayla had drank rum, ingested Xanax and Vicodin, and had heroin injected into her as well. (State's Ex. 2). Dr. Valesquez testified that Jayla's urine tested positive for Benzodiazepines and opiates. (Feb. 4-5, 2010 Tr. at 183). Dr. Valesquez's diagnosis of Jayla was threefold: (1) attempted suicide, unresponsiveness secondary to drug overdose/alcohol intoxication; (2) alcohol intoxication; and (3) positive for opiates and Benzodiazepines. (Id. at 185); (State's Ex. 2). Dr. Valesquez explained that unresponsiveness secondary to drug overdose means:

> **\* \* it's the condition of the patient because pass the threshold where your body can handle in a normal level. You become suppressed. Your respiratory drops so you don't really breathe;**

**and you become cloudy and your brain become, basically, taken by the effect of the drug, which is sedation.**

(Id. at 185-86). Dr. Valesquez testified that this condition is very serious and can cause death. (Id.). On cross-examination, Dr. Valesquez testified that Jayla's blood alcohol level was .219 grams of alcohol per 210 liters of breath, which he described as moderate intoxication. (Id.). He further testified that the alcohol would have increased the effect of any heroin Jayla may have injected. (Id. at 187). He also testified that Benzodiazepine is a family of medication that is prescribed for anxiety. (Id. at 188). The medical reports, State's exhibits two and three, were admitted into evidence without objection. (Id. at 194).

{¶20} After Dr. Valesquez's testimony, the State rested. (Id. at 195). Thereafter, the defense presented seven witnesses. (Feb. 4, 2010 Tr. Vol. II at 200). Paul McGlone, the owner of Al Smith's Motel, testified that Jayla was taken from his motel by ambulance in August 2009. (Id. at 201-02). McGlone testified that he did rent a room to Jayla, but not the first night she was there. (Id. at 202). McGlone testified that Megan Rumer, who was staying in room number 40, allowed Jayla to take her room the first night. (Id.). He gave Megan another room when she came to him asking for another key. (Id.). McGlone testified that he did not have either of the girls register for the rooms, take either of their drivers' licenses, or even initially charge them for the rooms. (Id. at 202-03). McGlone explained that he allows individuals he knows to just "sign in" for a room if they

agree to pay him later; however, McGlone admitted that the girls did not sign in this time. (Id. at 203). McGlone testified that Rumer and Jayla paid for the second night at the motel, but he did not give them a receipt. (Id. at 204). McGlone also testified that Jayla came over to his room at the motel and asked him for a spoon and some cups. (Id. at 205). McGlone testified that he tried to give Jayla a plastic spoon at first, but she did not want a plastic spoon, so he gave her a metal spoon. (Id.). McGlone denied knowing why Jayla wanted the spoon or knowing that she was doing drugs. (Id. at 206).

{¶21} Heather Massey testified that Jayla was her best friend whom she has known for three years. (Id. at 209). Massey testified that, in August of 2009, she was at Fireland's bank getting money for a movie when she called Jayla's cell phone but could only get her voicemail. (Id. at 210-11). Massey then called Johnson and asked if she could speak to Jayla, but Johnson told her she was asleep. (Id. at 211). Massey told Johnson that she would just talk to Jayla in the morning and hung up. (Id.). Johnson then called Massey back to tell her that he could not wake Jayla up, so Massey quickly went to the motel. (Id.). When she arrived at the motel, Massey observed Jayla lying on the ground next to the bed unconscious, and Johnson splashing water on Jayla's face trying to wake her up. (Id.). Massey then attempted to wake Jayla up but could not so she decided to call 9-1-1. (Id. at 212). Massey testified that she had talked with Jayla earlier that day,

and Jayla told her that Johnson and she were going to get a room at the motel for some privacy. (Id. at 212-13). Massey further testified that Johnson did not ask her to call 9-1-1. (Id. at 213).

{¶22} Ciera Reinhart, one of Jayla's friends, testified that on August 16, 2009 around 1:00 p.m. while they were at Jayla's house, she allowed Jayla to use her cell phone. (Id. at 217-19); (Id. at 227). Reinhart testified that the text messages on her phone were coming from Johnson's phone number, and that Johnson admitted to her that he was the one texting Jayla. (Id. at 220). Reinhart indentified a portion of joint exhibit one, Lieutenant Kent's report, as a transcription of the text messages Johnson sent to Jayla. (Id. at 220-21). Reinhart admitted that she has previously used drugs, including heroin, and assumed that Jayla has done so as well. (Id. at 221). Reinhart testified that Jayla wanted to try some drugs the day she was texting Johnson. (Id. at 222). According to Reinhart, Jayla asked her to come to her house so that she could use her cell phone, since Jayla's mom was at work and had their cell phone. (Id.); (Id. at 227). Reinhart testified that, after she read the text messages between Jayla and Johnson, she warned Jayla's mother that Jayla was thinking about using heroin. (Id. at 222-23). Reinhart further testified that Jayla's mother and boyfriend, Joe, arrived at the house later in the day, and that Dion McKinney was outside of the house waiting to use the phone. (Id. at 223). Johnson and several of Jayla's family members

were with Jayla at the hospital according to Reinhart. (Id. at 225). Reinhart testified that Jayla was not drinking alcohol when she was at her house, but that it was possible that Jayla drank alcohol after she left since Jayla drank in the past. (Id. at 226).

{¶23} On cross-examination, Reinhart identified State's exhibit five (5) as her written statement, which she wrote at the hospital. (Id. at 228). Reinhart read her statement in open court, without objection, which was as follows:

> **I picked up Jayla at Al Smith's with Paul McGlone on my way home. She asked me to come to her house and hang out with her. I went to her house. We made it there by 10:00 to 10:30 a.m. When we went inside, she told me she had been seeing a guy named Eddie who dealt heroin but that he didn't do it, then finally she confessed that he did do heroin and that the night before he shot her up and missed the vein * * * So she showed me the lump on her arm and then -- and then the vein he shot her in and made it. She started using my phone to text him because he wouldn't answer for her phone. The texting started at 12:30 p.m. and she promised me that she didn't want to try again, she was only curious. Then she had to stop using my phone because I had to go home at 2:00 p.m. and I left.**

(Id. at 228-29). Reinhart testified that Dion McKinney was sitting outside of the house but may have walked into the house to use a phone at some point, but that McKinney was not allowed in the house because he had stolen from Jayla's family before. (Id. at 231).

{¶24} Rhonda Furr, Jayla's mother, testified that Jayla was nineteen years of age and lives with her. (Id. at 232-33). Rhonda testified that Jayla was at home

all day Saturday until the early evening when she left with Johnson to go to the motel. (Id. at 234-35). Rhonda further testified that Jayla returned home around 3:00 on Sunday. (Id. at 235). Rhonda testified that she and her boyfriend, William, were at the house at that time, and that Reinhart and McKinney could have been there, but she was not sure. (Id. at 236-37). Rhonda testified that later Sunday evening she was drinking Lady Bly rum, but denied that Jayla had taken any prescription medications. (Id. at 238-39). Rhonda denied having a prescription for Xanax at that time, but did acknowledge that Jayla had a prescription for Vicodin. (Id. at 239-40). Rhonda testified that she had about a liter of liquor Sunday night, and Jayla had a couple of shots at the hotel with them. (Id. at 240). Rhonda testified that her boyfriend and she took Jayla and Johnson to the motel around 5:00 p.m. on Sunday evening. (Id. at 241). Rhonda denied seeing Jayla take any Vicodin while they were at the hotel, but did admit that the Vicodin was at the hotel with Jayla. (Id. at 242).

{¶25} Dion McKinney testified that he was acquainted with Jayla Furr and her family, and that he was at the Furr residence from around 4:00 to 6:00 p.m. on Sunday night. (Id. at 245-46). McKinney testified that Cliff Stanley, Jayla and Rhonda Furr, and Rhonda's boyfriend, Joe, and he were all in the kitchen Sunday evening. (Id. at 246). McKinney testified that, while Jayla was getting ready for a date with Johnson, he observed Jayla "doing Xanax and Vicodin on the kitchen

table and drinking Lady Blys with her mother and Joe." (Id.). McKinney testified that he was sure Jayla was taking Xanax and Vicodin that night because Jayla showed him the pills, and he has taken them before. (Id.). McKinney testified that everyone at the house was taking the pills and drinking, including himself. (Id. at 247). McKinney testified that Jayla took "probably two or three apiece" of the Xanax and Vicodin pills with the alcohol. (Id.). McKinney also testified that he was with Jayla the morning after she was discharged from the hospital, and that Jayla wanted to get more pills, and that her mom reluctantly bought her more pills from a guy down the street. (Id. at 248). On cross-examination, McKinney testified that he spent some time with Johnson in the county jail, and the two of them talked about what happened to Jayla. (Id. at 249). McKinney also admitted that he had been convicted of theft, attempted theft, breaking and entering, and receiving stolen property. (Id. at 250-51).

{¶26} Megan Rumer testified she was currently staying in a halfway house, and she had a prior felony conviction. (Id. at 253). Rumer testified she had contact with Jayla in August 2009 at Al Smith's motel. (Id. at 254). Rumer, however, refused to answer any more questions, asserting her right against self-incrimination. (Id. at 254-56).

{¶27} Jayla Furr testified she was romantically involved with Johnson in August 2009. (Id. at 257-58). Jayla testified her mother drove her to the motel

around 5:00 p.m. on Sunday to party. (Id. at 258-59). Jayla testified she drank quite a bit of Yager alcohol, and Jayla admitted she took Xanax and Vicodin pills as well. (Id. at 259). Jayla testified she had a prescription for the Vicodin from her dentist, and she obtained the Xanax from an illegal source. (Id. at 259-60). Jayla testified she had sex with Johnson but denied ever paying for the heroin. (Id. at 260). She identified defense exhibit A as a letter she wrote to Johnson dated September 24, 2009. (Id. at 261-62). Jayla testified Johnson never forced her to do anything the night of the incident, and she did not blame Johnson for what happened to her that night. (Id. at 263-64). Jayla admitted to sending the text messages to Johnson as they appeared in joint exhibit one, Lieutenant Kent's report. (Id. at 264-65). Jayla testified she took Vicodin, Xanax, and drank alcohol prior to arriving at the motel Sunday evening. (Id. at 265). Jayla further testified Johnson helped her inject the heroin after she asked him to do it. (Id. at 265). Jayla also testified Reinhart, Rumer, and her other friends have all used heroin and pills, but Jayla denied Johnson corrupted her with drugs. (Id. at 266).

{¶28} On cross-examination, Jayla testified she did not recall telling Detectives Heydinger or Filliater that Johnson had provided her the Xanax. (Id. at 267). Jayla did recall informing the detectives that Johnson provided her heroin for the first time on Saturday and a second time on Sunday. (Id.). Jayla also testified Johnson injected her with the heroin both on Saturday and Sunday,

because she had no idea of how to use heroin. (Id. at 268). Jayla further testified she is aware that she almost died the night of her overdose. (Id.). Jayla testified Johnson did not bring Yager with him; but instead, they went to her mother's house and they bought it then. (Id. at 269-70). On re-direct examination, Jayla testified Johnson gave her mother the money for the alcohol, and her mother bought the alcohol. (Id. at 271).

{¶29} Johnson testified he met Jayla about two months before the August incident occurred. (Id. at 285-86). Johnson admitted he possessed heroin, and he did not initially tell law enforcement the entire truth. (Id. at 286-88). Johnson testified he had never met Reinhart until the incident happened. (Id. at 289). Johnson also admitted that he sent the text messages to Jayla as they were transcribed in joint exhibit one, Lieutenant Kent's report. (Id. at 290). Johnson testified that, after Jayla asked him for more heroin, he text messaged her that she should not do that anymore. (Id. at 291). Johnson testified he was exposed to heroin when he moved to Bucyrus, and he had never used illegal drugs prior to that. (Id.). Johnson also testified that his previous wife died in 2007, as a result of an auto accident, and that he wanted Jayla to fill that void in his life. (Id. at 292). Johnson testified that Jayla had a spoon in the motel room, but that he did not go with her to get the spoon. (Id. at 294). Johnson testified he remembers people drinking at Jayla's house on Sunday evening, but Johnson testified that Jayla

provided him with Xanax. (Id. at 296). According to Johnson, Jayla obtained Xanax from a person who lived next door to her mom. (Id. at 297). Johnson identified defense exhibit A as the letter Jayla wrote to him while he was in jail. (Id. at 299). Johnson admitted to being previously charged with possession of a controlled substance in Kentucky; however, he testified that the charge was dropped to an improper container charge after he provided proof of a prescription from his doctor. (Id. at 301). Johnson testified that it was never his intent to corrupt Jayla with drugs. (Id. at 303). Johnson testified that he reluctantly provided Jayla with the heroin, because she stated that she would get it from someone else, and he wanted to be with her in case something bad happened. (Id. at 304).

{¶30} On cross-examination, Johnson admitted the possession and falsification charges. (Id. at 305). Johnson testified that he had used Xanax, marijuana, and heroin on the evening of the incident. (Id. at 306). Johnson denied drinking alcohol on the weekend, but admitted that he purchased alcohol for Jayla's mother. (Id. at 308). Johnson testified that he could not recall if that weekend was Jayla's first time using heroin, though he was not disputing that fact since he did not know. (Id. at 310). Johnson admitted that Jayla texted him requesting heroin for Sunday, which was the second time she had used heroin. (Id. at 314). Johnson also testified that he was familiar with people in the community

that sold heroin, and heroin was one of the easiest drugs to obtain. (Id. at 315-16). On re-direct examination, Johnson testified that Reinhart used heroin, and she showed him the track marks on her arms. (Id. at 322).

{¶31} At the close of the evidence, the defense made a Crim.R. 29(A) motion, which the trial court denied. (Id. at 326). Thereafter, the jury returned guilty verdicts upon all three counts. (Id. at 376-78); (Doc. Nos. 20-22).

{¶32} After reviewing the evidence, we conclude that the State presented sufficient evidence to convict Johnson of corrupting Jayla with drugs. There was testimony that Johnson injected Jayla with heroin for the first time on a Saturday in August 2009, and that Jayla asked him for more heroin the very next day, Sunday. There was also testimony that Johnson provided Jayla the Xanax, and that Jayla wanted more Xanax after being discharged from the hospital after overdosing. Furthermore, there was also testimony that Jayla almost died as a result of the alcohol, Xanax, Vicodin, and heroin in her system. There was testimony that Johnson provided Jayla with all of these substances, except the Vicodin, and that Jayla suffered serious physical harm as a result of taking these controlled substances. R.C. 2925.02(A)(3). As such, Johnson's conviction for corrupting Jayla with drugs was supported by sufficient evidence. Furthermore, after reviewing the evidence, we cannot conclude that Johnson's conviction is

against the manifest weight of the evidence. The jury neither lost its way nor created a miscarriage of justice in convicting Johnson.

**{¶33}** Johnson's first and second assignments of error are, therefore, overruled.

## ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT DID NOT COMPLY WITH ALL APPLICABLE RULES AND STATUTES IN IMPOSING THE SENTENCE AS SET FORTH IN R.C. 2929.11 AND 2929.12 OF THE OHIO REVISED CODE AND ABUSED ITS DISCRETION WHEN IT IMPOSED A SENTENCE OF SEVEN YEARS IMPRISONMENT.**

**{¶34}** In his third assignment of error, Johnson argues that the trial court erred by failing to consider his likelihood of recidivism and Jayla's inducement for him to commit the crime. Johnson further argues that the trial court abused its discretion by sentencing him to seven years imprisonment since he was a first-time felony offender. We disagree.

**{¶35}** A trial court must consider R.C. 2929.11 and R.C. 2929.12 when sentencing a felony offender. *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶38. A sentence imposed without any consideration given to these statutes is contrary to law. See *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶¶13, 18. When the record is silent concerning the trial court's consideration of these sentencing statutes, it is presumed that the trial court considered them. Id. at ¶18, fn. 4, citing *State v. Adams* (1988), 37 Ohio St.3d 295,

- 22 -

297-98, 525 N.E.2d 1361. Furthermore, the trial court is not required to either discuss the factors on the record or even to state that the factors were considered on the record, as long as the record is sufficient for a court to determine that the consideration occurred. *State v. Ditto*, 3d Dist. No. 12-09-08, 2010-Ohio-1503, ¶4, citing *State v. Scott*, 3d Dist. No. 6-07-17, 2008-Ohio-86.

{¶36} The record in this case is sufficient to determine that the trial court considered R.C. 2929.11 and 2929.12 as required by law. Prior to sentencing Johnson, the trial court stated:

> * * * **I've been through the PSI and, of course, I sat through the trial. And I have, in arriving at a sentence in this case, looked at the Purposes and Principles of Sentencing which, of course, as we all know, means I need to craft a sentence that's commensurate with the seriousness of the offense, it isn't demeaning to the offenses, one that punishes the -- punishes the offender and protects the public. These are the principles that are first and foremost in my mind as I look at this case.**
> * * * **I have weighed the seriousness factors. And here we have a case where the victim did suffer physical harm based on the conduct of the Defendant. And he used his relationship with a girl, a woman who was 15 years younger than he is, to commit this offense. * * * although he has no felony record, this does shakedown as a case where more serious punishment is appropriate.**
> **I've also considered the effect that sentencing this Defendant would have on the prison system. And although we do have a crowded prison, this is a case where I think they need to make room.**
> * * * **I just want to point out that the testimony I heard was that this Defendant not only did he knowingly inject a person 15 years younger than he is with heroin, a person that was already highly intoxicated and on other drugs, and he knew it.**

> **\* \* \* This Court sentences you to seven years at the Lorain Correctional Institution. I'm not giving you the maximum only because of your lack of prior record and because the law requires \* \* \* me not to give you a maximum sentence except if you're the worst offender and in the worst form of the offense.**
> **But I would love to agree with Mr. Murphy and give you the max, but I don't think, by law, it would be proper.**

(Mar. 22, 2010 Tr. at 10-13). In its judgment entry, the trial court notes that it considered the record, oral statements, any victim impact statement, the PSI, R.C. 2929.11 and 2929.12, and had balanced the seriousness and recidivism factors under R.C. 2929.12. (Mar. 31, 2010 JE, Doc. No. 27). Since the record demonstrates that the trial court properly considered R.C. 2929.11 and 2929.12, we cannot conclude that the trial court's sentence is contrary to law.

{¶37} Next, Johnson argues that the trial court abused its discretion by sentencing him to seven (7) years since he was a first-time felony offender. We disagree. To begin with, the trial court was aware of Johnson's lack of prior felony record and, in fact, noted that it was not sentencing Johnson to the maximum of eight (8) years for that reason. (Mar. 22, 2010 Tr. at 12-13). Furthermore, Johnson had a prior possession of marijuana conviction and a pending first degree possession of a controlled substance charge, both in Kentucky. (PSI). Additionally, Johnson's conduct resulted in serious physical harm to the victim that was life-threatening, and his conduct was facilitated by his relationship with the victim. After reviewing the entire record, we cannot

conclude that the trial court abused its discretion by sentencing Johnson to seven (7) years incarceration.

{¶38} Johnson's third assignment of error is, therefore, overruled.

{¶39} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J., and ROGERS, J., concurs.**

**/jnc**